Herbert B. LOCKSLEY, et al.,
Appellants,

v.

ANESTHESIOLOGISTS OF CEDAR
RAPIDS, P.C., a professional corpora-
tion, Plenny J. Bates, Allen E. Berndt,
Richard H. Bobenhouse, William G.
Kruckenberg, Donald L. McCoy, Robert
J. Meyer, William H. Middleton, Dale D.
Morgan, Joseph A. Nizolek, Jr., Merlin
G. Osborn, John P. Parks, Donald A.
Paulsen, John D. Schuchmann, Raymond
A. Shank, Mercy Hospital, Cedar Rap-
ids, Iowa, and St. Luke's Methodist Hos-
pital, Cedar Rapids, Iowa, Appellees.

No. 66316.

Supreme Court of Iowa.

April 20, 1983.

Rehearing Denied May 12, 1983.

Naomi Mercer and Bernard Mercer of Mercer & Mercer, P.C., Mark D. Ravreby, and James P. Cleary, Des Moines, for appellants.

Raymond R. Stefani and Richard A. Stefani of Silliman, Gray & Stapleton, Cedar Rapids, for appellees anesthesiologists.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, and James F. Pickens of Pickens, Barnes & Abernathy, Cedar Rapids, for appellee St. Luke's Methodist Hosp.

David A. Elderkin and Aldean E. Kainz of Elderkin, Pirnie, Von Lackum & Elderkin, Cedar Rapids, for appellee Mercy Hosp.

Before HARRIS, P.J., and McCORMICK, McGIVERIN, and LARSON, JJ., and LeGRAND, Senior Judge.

HARRIS, Presiding Justice.

Plaintiff, a neurosurgeon, brought this action against 14 anesthesiologists and two Cedar Rapids hospitals asserting their boycott prevented him from practicing his profession. The jury found for the defendants and we affirm.

Plaintiff [1] is a man of contradictions. He is superbly educated, trained, and undoubtedly has exceptional talent. He also tends to make disastrous mistakes. Plaintiff is a graduate of Harvard Medical School and was a professor of neurosurgery at the University of Iowa College of Medicine from 1959 to 1971. In 1971 he went into private practice as a neurosurgeon in Cedar Rapids and was granted staff privileges by both defendant hospitals.

Neurosurgery and anesthesiology are distinct medical specialties. Neurosurgery involves surgical procedures to alleviate disease or other problems occurring in the central nervous system, brain, and spinal cord. Anesthesiology involves the administration of general anesthetics to patients during surgery in order to render them insensitive to pain. Both neurosurgery and anesthesiology are highly complex specialties in which mistakes may be fatal. The two specialties do not compete for the same practice among patients; rather they are both vital components in the delivery of crucial health care.

The plaintiff's unpredictable propensities have given him many problems in his practice and have led to strained relationships with other doctors and nurses. His customary tardiness in completing operative re-

---

1. There are technically two plaintiffs: the neurosurgeon and his solely-owned professional corporation. For simplicity, reference to plaintiff's professional corporation will be omitted.

ports eventually led to his censure by Mercy Hospital's credential committee. But his tardiness problems pale when compared with his surgical mistakes. Evidence of those mistakes was disputed. But, taken in the light most consistent with the verdict, the record established the following illustrations. In July of 1972 the plaintiff left "hemostatic material" (sponge) in a patient's head, which was subsequently discovered in a second operation in December of 1972. In July of 1973 the plaintiff clipped the middle cerebral artery of a patient instead of an aneurysm (enlargement of artery wall). The patient died as a result ten days later. In September of 1973 the plaintiff opened the wrong side of a patient's head. After discovering his error he closed up the opening and performed the operation on the right side. Among professionals this is known as an error of laterality. In January of 1974 plaintiff placed a permanent clip on a patient's basilar artery (leading into the brain) again thinking it was an aneurysm. This patient died five days later. An autopsy indicated the clip was not placed where it should have been. In October of 1974 the plaintiff made his second error of laterality. Four hours into the surgery he discovered his error. Again the incision was closed and the operation begun on the proper side of the patient's head. This patient lost his sense of smell as a result of the unnecessary operation. The patient's malpractice suit was settled out of court. One anesthesiologist testified that only his last minute intervention prevented the plaintiff from making another such error of laterality.

On December 4, 1974, the anesthesiologists advised plaintiff in writing they had learned the credentials committees of the two defendant hospitals were conducting inquiries into his general competence to maintain surgical privileges. The notice informed the plaintiff that they would not administer anesthesia services for him until the investigation was completed. The two hospitals' investigations began the same day and, over the next three months, considered 51 of plaintiff's cases in one hospital and 30 in the other.

The responses of defendant hospitals to the investigations were equivocal and their position in this litigation would have been considerably strengthened by a more resolute disposition. The plaintiff was able to point to moderate hospital action as evidence that his professional competence was not then considered to be as suspect as the anesthesiologists believed. Nevertheless both hospitals imposed restrictions on him. For example plaintiff was to mark the site of planned surgery on a patient with indelible ink.

The hospitals also jointly requested a peer review of plaintiff by the Iowa Midwest Neurosurgical Society. The committee reported that plaintiff was "not incompetent" but conceded hospital records suggest that he had been careless and negligent. It also found instances of errors in surgical judgment, evidence of questionable judgment, and technical errors. The report concluded: "Errors of judgment happen to all of us, but the repetition of the same error is difficult to excuse. Some of the hospital criticisms suggest finding fault for the sake of finding fault and are nit-picking."

After receiving the peer review committee report the hospitals retained the temporary guidelines on plaintiff's surgery. The anesthesiologists were disturbed by the peer committee's choice of words (plaintiff was found "not medically incompetent"). Lacking direction on how to effectively monitor plaintiff during surgery the anesthesiologists sought clarification of the monitoring procedures. Neither hospital ever elaborated on the guidelines.

The anesthesiologists continued to refuse to supply anesthesia to plaintiff. They determined plaintiff was a risk to the patient and several testified their decision to deny the anesthesia service "was made to advance their concern for the safety, protection, and well-being of the patient." The peer committee, on the other hand, expressed the opinion that plaintiff "should be allowed to resume his work as a neurological surgeon."

In the fall of 1975 both hospitals approved plaintiff's membership on the active medical staff but made no effort to obtain anesthesia service for him. So far as we can learn from the record, plaintiff has not performed surgery since 1975. Plaintiff filed this suit in November, 1976.

■ I. Plaintiff's first assignment of error challenges the trial court's refusal to change venue. A decision to grant or to deny such a motion rests in the sound discretion of the trial court under Iowa R.Civ.P. 167. *See Thompson v. Rozeboom,* 272 N.W.2d 444, 447 (Iowa 1978). Iowa R.Civ.P. 168(d) provides: "Changes of venue shall not be allowed . . . after a continuance, except for a cause arising since such continuance or not known to movant prior thereto . . . ."

■ Plaintiff argues that because the defendants comprise the only two hospitals in Cedar Rapids and most of the city's anesthesiologists they would have undue influence on a Linn County jury.

As noted, this suit was filed in 1976 and discovery was then undertaken. Plaintiff's motion for change of venue was filed August 8, 1980, after two continuances had been granted. We cannot believe that plaintiff's knowledge of the defendants or their possible effect on a jury occurred to him suddenly in 1980. There was no abuse of discretion in denying the motion. *See Jackovach v. Yocom,* 212 Iowa 914, 916–18, 237 N.W. 444, 446 (1931).

Plaintiff orally renewed his motion for change of venue on the basis of media publicity. Such challenges generally arise in criminal cases where the test is whether defendant demonstrates a reasonable likelihood that he would be unable to receive a fair trial. *See State v. Pelelo,* 247 N.W.2d 221, 223 (Iowa 1976). In this civil case the trial court's decision is reviewed for an abuse of discretion; but the cases discussing the impact of publicity in criminal cases are nevertheless instructive. We have stated:

Exposure to news accounts does not establish ipso facto a substantial likelihood of prejudice in the minds of prospective jurors. [Authorities.] An examination of the pretrial publicity discloses that it was, on the whole, objective, factual reporting. The media expressed no view on defendant's guilt or innocence. Nor was the pretrial coverage inaccurate, misleading, or unfair. . . . No attempts were made to inflame the public mind or to sensationalize the event.

*State v. Johnson,* 318 N.W.2d 417, 422 (Iowa 1982).

We find no prejudice to plaintiff as a result of the newspaper article shown in the record here. The extensive voir dire conducted on the subject of publicity indicates that no prejudice resulted. There was no abuse of discretion.

■ II. The plaintiff moved in limine in an effort to keep out all evidence of his competence—or lack of it. Trial court rulings which denied the attempts are assigned as error.

Plaintiff argues that the question of his competence was resolved in his favor by the peer review committee and that this resolution was binding on all the parties. There is widespread support for the proposition that a court should not substitute its evaluation of a doctor's competence for that of a hospital board. *See, e.g., Klinge v. Lutheran Charities Ass'n of St. Louis,* 523 F.2d 56, 61 (8th Cir.1975); *Sosa v. Board of Managers of Val Verde Memorial Hospital,* 437 F.2d 173, 177 (5th Cir.1971). These cases however must be read in context. They involve situations in which a doctor asked a court to overturn a hospital's revocation of his staff privileges. In each case the court refused to second guess the question and looked only to whether the hospital complied with due process before revoking staff privileges. *See Klinge,* 523 F.2d at 61; *Sosa,* 437 F.2d at 176–77.

The question here is much different. The defendants raised the affirmative defense of justification, asserting their refusal to supply plaintiff with anesthesia services was based on their concern for the protection, safety, and well-being of patients in view of the numerous incidents of what

they considered to be incompetent care rendered by Locksley. The challenged evidence went to refute plaintiff's contention that they willfully, illegally, and maliciously removed him from the practice of neurosurgery.

Justification was an appropriate defense in these circumstances. The issue of justification is determined by the standard of reasonable conduct under all the circumstances. *See Restatement (Second) of Torts*, § 767, comment b (1979). It is generally not a legal question for the courts to decide, but a factual one for the jury: do the social benefits (here the safety and welfare of the patients) derived from allowing the interference (here the alleged boycott) outweigh the harm produced? *See Frank Coulson, Inc.—Buick v. General Motors Corp.*, 488 F.2d 202, 206 (5th Cir.1974); *Restatement (Second) of Torts*, § 767, comment b (1979).

Without doubt plaintiff's competence was at the heart of the questions both before the hospitals and the jury. But the questions differed and so could the answers. The issue for the hospitals was whether plaintiff was sufficiently competent to remain, with restrictions, on their medical staffs. The issue in the suit before the jury was whether the anesthesiologists were justified in their conduct. The determination of the peer review committee was a factor to be considered in the law suit. But the committee determination was not binding on the jury in its consideration of the defense of justification.

The assignment is without merit.

■ III. The plaintiff separately assigns as error a ruling by which the trial court refused to submit a proposed instruction that plaintiff was competent as a matter of law. The proposed instruction was based on the theory we considered and rejected in the previous division. Plaintiff believes his competence was already determined by his peers and should not be the subject of a de novo review by the jury. Furthermore, according to plaintiff, defendants were not justified in refusing to provide him with anesthesia services for the reason they were bound by the medical staff bylaws which left the matter of a physician's competence up to the board.

■ It is fundamental that it is error to submit an instruction advising the jury that certain facts are undisputed when there is conflicting evidence on the question. *See Jordan v. Sinclair Refining Co.*, 257 Iowa 813, 820–21, 135 N.W.2d 120, 124–25 (1965). Plaintiff's competence was a matter of considerable dispute notwithstanding the determination of the hospital board. At trial plaintiff was the first to testify and sought to explain his surgical errors. Defendants introduced other expert testimony that contradicted the hospitals' earlier conclusions as well as contradicting plaintiff's own assessment of his ability. Plaintiff's proposed instruction was inappropriate and was properly refused.

■ IV. Another assignment relates only to plaintiff's claim against the hospitals. Although he equivocated by way of alternative requests, plaintiff submitted a proposed instruction which would have informed the jury that the hospitals "had a legal duty to provide anesthesia services for . . ." plaintiff.

The trial court refused and instead instructed the jury on ways it should consider plaintiff's claim that the hospitals had such a duty. In one instruction the jury was told of plaintiff's contention that the hospitals were contractually bound to provide the services. In order for plaintiff to recover on the contract theory, the jury was told, plaintiff had to show among other things his staff status, performance of his own duties under the contract, that anesthesiologists refused to provide the services and "that the defendant hospitals failed and refused to insist upon . . . [the performance of anesthesia services] by the anesthesiologists, *or to take action to see anesthesia service was provided to plaintiff Locksley.*" (Emphasis added.)

In another instruction the jury was advised that the hospitals owed plaintiff a duty to follow their bylaws in dealing with him. This, according to the instruction, "in-

cluded an obligation to take those steps which a reasonably prudent hospital administration would take to attempt to resolve the dispute between staff members, Locksley and the anesthesiologists, and to ensure compliance with the decisions of their respective medical staffs."

The jury was also instructed on plaintiff's negligence claim against the hospitals. In connection with that claim the jury was told that one of the specifications of negligence for which they might allow recovery was that the hospitals "failed to follow their own rules, regulations, and bylaws to ensure that anesthesia service was provided to plaintiff Locksley."

Plaintiff points to admissions made by defendant St. Luke's Hospital and relies heavily on a manual of the joint commission on accreditation of hospitals to support his contention that hospitals must provide him with the services.

The trial court committed no error in refusing the requested instruction.

■ V. Plaintiff separately assigns as error the trial court's refusal to grant his motion for directed verdicts. In making the motion plaintiff assumed a heavy burden. *See* Iowa R.App.P. 14(f)(2), (17). The burden is even heavier here because the motion for directed verdict was made by the plaintiff. "[S]eldom does a party having the burden of proof satisfy that burden as a matter of law." *Freese v. Lemmon,* 267 N.W.2d 680, 686 (Iowa 1978).

One of the theories of recovery made the subject of the motion was plaintiff's contention that the anesthesiologists combined and conspired with one another and with the hospitals to remove him from the practice of neurosurgery. Principles of civil conspiracy were discussed in *Basic Chemicals, Inc. v. Benson,* 251 N.W.2d 220, 232–33 (Iowa 1977):

A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful. It may be proven by substantial evidence. [Author-

ity.] It is a recognized aspect of Iowa substantive law. [Authority.]

The principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury. [Authority.] Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action. [Authority.]

Plaintiff points out that all anesthesiologists signed letters stating they would not provide him with anesthesia services, plainly "combined" action. Plaintiff argues this action was unjustified and that the anesthesiologists had to know he would be harmed. The anesthesiologists however testified they had no intent to injure plaintiff and did not intend to eliminate him from the practice of neurosurgery. They insisted their only concern was for the safety, protection, and well-being of the patient. Plaintiff himself testified he did not think they intended to interfere with his business and that such a result was "quite incidental." He also admitted he had no direct evidence of a conspiracy. A hospital administrator and three anesthesiologists denied they were part of a conspiracy. Given the conflicting claims of the parties we find no conspiracy was established as a matter of law.

Plaintiff also moved for directed verdict on his breach of contract claim. The argument here is identical to that urged in support of plaintiff's fourth assignment of error. We previously pointed out that plaintiff was not entitled to his requested instruction on the hospitals' legal duty to supply him with anesthesia services. Plaintiff now argues that on the basis of this same evidence he was entitled to a directed verdict. For the reasons pointed out in connection with the fourth assignment of error we disagree.

Plaintiff's third ground for directed verdict was on his negligence claim. Plaintiff's burden here is even heavier. "Gener-

ally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law." Iowa R.App.P. 14(f)(10). "Even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them a jury question is engendered." Iowa R.App.P. 14(f)(17). The jury was well informed of plaintiff's theory of negligence. This was not the type of "exceptional case" where negligence or proximate cause exist as a matter of law.

Finally, plaintiff argues he was entitled to a directed verdict on his claim of interference with a contractual relationship, a claim asserted against the anesthesiologists. There are four elements to the tort:

> The trial court found both defendants liable on a theory of conspiring in the commission of the business tort of interference with contractual relations. The elements of the tort are: an existing valid contractual relationship or business expectancy, knowledge of this by the interferer, intentional interference inducing or causing a breach or termination of the relationship or expectancy, and resulting damage. [Authorities.]

*Westway Trading Corp. v. River Terminal Corp,* 314 N.W.2d 398, 402–03 (Iowa 1982). It must be remembered that the anesthesiologists raised the defense of justification. Such a defense is best left for a jury to evaluate. *Restatement (Second) of Torts,* § 767, comment 1 (1979). The trial court did not err in overruling plaintiff's motion for a directed verdict.

VI. Plaintiff's final assignment is addressed to the trial court's ruling denying his motion for a new trial. He argues: (1) he did not receive a fair trial, (2) the verdict was the result of passion and prejudice, and (3) substantial justice was not effectuated because the jury did not respond to the merits of the case, but instead deliberated only three hours. Under the standards by which we review rulings on such motions, *see Thompson v. Rozeboom,* 272 N.W.2d 444, 446 (Iowa 1978), we find the trial court did not abuse its discretion. The three

hours spent in deliberation by the jury does not qualify as a basis for a new trial. *See Lappe v. Blocker,* 220 N.W.2d 570, 574 (Iowa 1974). There was substantial evidence to support the jury's determination and we find no reason to interfere with the discretion of the trial court in overruling the new trial motion.

Because we find all of plaintiff's assignments of error to be without merit we affirm the judgment of the trial court.

AFFIRMED.