Mohammad ISLAMI, M.D., Plaintiff,

v.

COVENANT MEDICAL CENTER, INC., Timothy Wilson, Richard D. Waldorf, and James F. Connell, Jr., Defendants.

No. C 90–2076.

United States District Court, N.D. Iowa, E.D.

Dec. 22, 1992.

Nick Critelli, Nick Critelli Associates, P.C., Richard M. Calkins, Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, IA, for plaintiff.

Edward J. Gallagher, Jr., Gallagher, Langlas & Gallagher, P.C., Waterloo, IA, Myra C. Selby, Sherry A. Fabina–Abney, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for defendants.

## ORDER

MELLOY, Chief Judge.

This matter comes before the court on the parties' cross motions for summary judgment. The plaintiff, Dr. Mohammad Islami (Dr. Islami) filed a motion for summary judgment on the portion of his complaint alleging breach of contract. The defendants, Covenant Medical Center, Inc., Dr. Timothy Wilson, Dr. Richard D. Waldorf, and Dr. James Connell, Jr., filed a motion for summary judgment on the portion of Dr. Islami's complaint alleging federal antitrust violations, intentional interference with a business relationship, and intentional infliction of emotional distress. Both summary judgment motions were resisted.

### Background

Chief Magistrate Judge John A. Jarvey already has held a full-scale evidentiary hearing in this case on Dr. Islami's application for a preliminary injunction. Judge Jarvey provided an extensive discussion of the factual background of this case in his Report and Recommendation denying the application for the preliminary injunction. The court will borrow heavily from Judge Jarvey's recitation of the facts in that document in providing the undisputed background facts here.[1]

Dr. Islami is a board certified cardiovascular and thoracic surgeon licensed to practice in Iowa and other states. He held staff privileges at defendant Covenant Medical Center ("Covenant" or "the hospital") in Waterloo, Iowa from 1984 until he was suspended on May 14, 1990. He presently holds staff privileges at Allen Memorial Hospital in Waterloo, Iowa, Sartori Memorial Hospital in Cedar Falls, Iowa, and Peoples Memorial Hospital in Independence, Iowa.

Covenant is a private, not for profit hospital with an inpatient capacity of 336 beds. It has an active staff of approximately 80 physicians. Together with the courtesy staff, approximately 140 physicians serve the hospital. It is a Medicare and Medicaid provider. It is the largest hospital in the Waterloo area.

Defendant Dr. Timothy Wilson (Dr. Wilson) is an oral and maxillofacial surgeon and was, at the times relevant to this lawsuit, chair of the surgery department at Covenant. Defendant Dr. Richard D. Waldorf (Dr. Waldorf) is a general surgeon with staff privileges at Covenant. He has performed thoracic surgeries as a part of his practice. Defendant Dr. James F. Connell, Jr. (Dr. Connell) is a radiologist and holds staff privileges at Covenant and operates the Covenant radiology laboratory. Dr. Connell is a radiologist and was a member of Covenant's Executive Committee.

Dr. Islami began practicing medicine in the Waterloo/Cedar Falls area in 1984. He had his offices at Allen Memorial Hospital from 1984 to 1988. He moved his offices to

---

1. The court is not adopting any of Judge Jarvey's disputed factual findings. Those findings were made in connection with a hearing on issuance of a preliminary injunction. Although this court adopted Judge Jarvey's Report and Recommendation, those findings on disputed issues of material fact are given no consideration in this decision on the cross motions for summary judgment. The evidentiary record made as part of the preliminary injunction hearing has been relied upon by both sides in arguing their respective positions on the issues raised in the summary judgment motions.

Covenant in 1988 upon the invitation of Lewis Raker, Covenant's chief operating officer.

Dr. Islami set up his practice in an office building attached to Covenant and obtained permission from Covenant's President, Ray Burfiend, to operate a vascular testing laboratory out of his office. On August 5, 1988, Dr. Islami signed a lease with Covenant to operate the lab.

Dr. Islami equipped the lab with over $400,000 worth of diagnostic equipment which he purchased from outside of Iowa. Since then he has purchased several hundred thousand dollars worth of lab supplies from outside of Iowa. Dr. Islami has used this lab only to perform noninvasive tests. Some of those tests initially were unavailable at the hospital's radiology lab at the time Dr. Islami opened his vascular lab.

Dr. Islami's laboratory became an immediate success. He received a large number of referrals to his lab from other physicians serving Covenant. Lewis Raker, Covenant's chief operating officer, raised concerns about the lab and its relationship to Covenant's own radiology lab (Exhibit 4, pp. 12–14). Covenant raised concerns about liability and quality assurance matters including the safety of patients being transferred to labs outside the hospital proper. Dr. Islami asserts that the hospital was concerned about the competition to the hospital's own lab presented by Dr. Islami's lab and the potential of other labs that other physicians might want to establish.

At one of the Executive Medical Staff Committee meetings where Dr. Islami's laboratory was being discussed, Dr. Connell expressed his displeasure with Dr. Islami's lab. Dr. Connell stated that he "wanted that vascular laboratory removed or there would be blood flowing in the hall." Dr. Connell does not recall making this statement but does not deny it.

Dr. Islami's lab also generated controversy over how patients would be billed for tests performed at Dr. Islami's lab. Dr. Islami treated a high percentage of Medicare patients. Medicare normally only reimbursed a hospital in a fixed sum for the patient's stay. Medicare expected laboratory costs to be absorbed by the hospital as part of that fixed sum. Dr. Islami, however, charged Medicare

for both the costs of treatment and the costs of the tests that he conducted in his lab. Covenant was concerned this resulted in a "double-billing" which was contrary to Medicare's intentions. Dr. Islami eventually agreed to charge only for his interpretation of tests, not for the tests themselves.

These concerns about Dr. Islami's laboratory caused the Executive Medical Staff Committee to establish a committee to study the problem of independent labs owned by physicians and report back to the Executive Committee. On November 29, 1988, an ad hoc committee met and a majority of the committee recommended that patients should not be taken to a physician's lab for testing if the test was available in Covenant's own lab. It also recommended that a physician have lab equipment certified. Dr. Wilson was a member of the ad hoc committee.

On January 24, 1989, the Executive Committee voted to require all inpatients to be taken to Covenant's laboratories for testing if tests were available and to a physician's laboratory only if the proposed tests were not available in the Covenant laboratory. Committee members "felt that it was reasonable to support the hospital and that the hospital is ultimately liable for the patient." The Executive Committee determined that Dr. Islami be informed that "tests significantly different from those done within Covenant would be allowed . . ." at his lab. Dr. Wilson and Dr. Connell were voting members of the Executive Committee.

In March of 1989, Dr. Wilson, the Chairman of the Surgery Department at Covenant, began a chart study of the vascular and thoracic surgeries at Covenant. Dr. Wilson asked that a computer search be made identifying all vascular and thoracic surgeries performed at Covenant Medical Center and that those files be pulled for study (Exhibit 6, p. 5). The record is unclear what prompted the study but it appears that it was originally suggested by Dr. Waldorf at some point prior to 1988 (Exhibit 27, p. 52–53). Of the 117 surgeries selected for the study, 95 were performed by Dr. Islami and the remaining were performed by 4 other surgeons (Exhibit 6, p. 5).

Because only a small number of physicians in the Waterloo–Cedar Falls area were performing these surgeries, Dr. Wilson determined that the medical charts should be reviewed at some point by an outside consultant with similar qualifications to Dr. Islami but who was not in competition with Dr. Islami. Dr. Wilson hired Dr. S. Alshabkhoun, a board certified thoracic, cardiac, and vascular surgeon to serve as the external consultant. Dr. Alshabkhoun practices in Chicago, Illinois, and was retained by agreement executed on March 14, 1989.

The review process began with an internal investigation. Dr. Wilson wanted the internal review to be performed by surgeons having the broadest range of relevant medical experience. He appointed Dr. Donald Hayes, a pathologist; Dr. Bernard Sand, a general surgeon; and Dr. Donald Bolin, an internist and head of the Department of Medicine, to conduct the internal review of the 117 surgeries conducted between January 1988 and April 1989. This panel was appointed on April 5, 1989.

The ninety-five charts from Dr. Islami were divided among the three physicians. The process of reviewing these surgeries took a considerable period of time. The physicians performed this peer review function without compensation and did it in addition to their ordinary duties, as time permitted. Of the 95 records of Dr. Islami reviewed, the reviewers questioned patient management or recommended further review in 45 of the cases. The questions ranged from claims of poor documentation to claims of unnecessary surgery.

In August of 1989, Dr. Wilson also requested Dr. Waldorf to do an independent review of Dr. Islami's charts. Dr. Wilson was aware that Dr. Waldorf wanted to do this study (Exhibit 6, p. 6). It is unclear from the record whether Dr. Waldorf reviewed all 95 of the charts or only the 45 identified for further review. Nonetheless, Dr. Waldorf's review completed the preliminary internal review.

On March 21, 1990, the Executive Committee of the Surgery Department met and were presented with the internal review preliminary report and notes of the reviewing physicians (Exhibit 6, p. 6). Of the 45 cases

recommended for further review, 28 involved vascular procedures and 17 involved thoracic procedures (Exhibit 6, p. 43). The Executive Committee recommended 23 of the patient charts for outside review by Dr. Alshabkoun. The Committee did not notify Dr. Islami that the review was being conducted.

On March 23, 1990, the Executive Medical Staff Committee met and Dr. Wilson presented information from the focus study conducted by Dr. Hayes, Dr. Sand, and Dr. Bolin (Exhibit 4, pp. 191–193). Dr. Wilson explained that the reviewers were not concerned with Dr. Islami's technique. In fact, the evidence has consistently shown that although some surgeons have questioned his surgical judgment, Dr. Islami is an excellent technical surgeon. Dr. Wilson explained that the reviewers were concerned with procedures being done when not indicated and inappropriate procedures were performed "prior to staging of patient's disease." The Executive Committee staff voted to set up an ad hoc committee to conclude the focus study and develop recommendations for presentation to the Executive Committee. The ad hoc committee consisted of Dr. Bolin, Dr. Hayes, Dr. Sand, Dr. Waldorf, and Dr. Wilson who served as its chairperson. The Executive Committee directed 23 vascular charts for review by the outside reviewer with the results to be considered by the ad hoc committee. Dr. Connell was a member of the Executive Committee passing on this resolution.

The Executive Committee then voted to notify Dr. Islami of the investigation and to restrict his privileges by requiring him to have a mandatory consultation with another physician prior to all planned surgical procedures (Exhibit 6, p. 192). They directed that the mandatory consultation requirement begin immediately. Dr. Islami was not given any advance warning of this restriction on his privileges. Further, the Executive Committee recorded no finding of imminent danger to the health of any individual as a reason to restrict Dr. Islami's privileges without prior notice and a hearing. The hospital notified Dr. Islami of the restriction on his privileges on March 29, 1990, in a letter from Dr.

Douglas Stanford, the President of the medical staff (Exhibit 4, p. 194).

Dr. Islami appealed the decision of the Executive Committee and a hearing was set on the appeal for April 26, 1990. Another ad hoc appeal committee was set up to hear the appeal of the second opinion requirement. The committee consisted of Dr. Stanford, Dr. Betts, Dr. Long, Dr. Phelps, and Dr. Savereide.

On April 4, 1990, Dr. Islami met with Dr. Stanford concerning the mandatory second opinion requirement. After this discussion, Dr. Stanford decided unilaterally to lift the restriction on Dr. Islami's practice pending outcome of the appeal. On April 11, 1990, Dr. Stanford notified Dr. Islami that his appeal would be heard on April 26, 1990 (Exhibit 5, p. 201).

On April 22 and 23, 1990, Dr. Alshabkhoun came to Waterloo to perform his review of the 23 vascular surgery charts the focus group identified for further review. Dr. Alshabkhoun's case-by-case findings are recorded in Exhibit 5 at pp. 215–232. He submitted a two-page report summarizing his findings (Exhibit 6, pp. 93–94). Dr. Alshabkhoun recommended that Dr. Islami write or dictate more detailed consultation notes, histories and physicals on all of his cases prior to surgery. He recommended that Dr. Islami be required to obtain a second opinion on all major surgeries and that the opinion be documented in his charts, and that a review be conducted of all of Dr. Islami's cases in three and six months. Dr. Alshabkhoun did not believe that any other sanction was warranted. He stated:

I specifically omitted any other sanctions. My goal is to improve the quality of care for thoracic and cardiovascular patients at your hospital. Punishment, recrimination, vengeance, etc. serve no remedial purpose. Ultimately, the hospital should not jeopardize its reputation and trust within the community. Divisiveness, and discord over Dr. Islami's matter among the various groups of the Medical Staff is not worth the risk entailed.

The issue of Dr. Islami having a Vascular Laboratory in his own office is not contradictory among other cardiovascular surgeons. However, these noninvasive vascular reports must accompany the patients' records when the patient is admitted to the hospital for vascular surgery.

Dr. Islami did not know Dr. Alshabkhoun had been hired by the hospital to review his charts, was unaware of Dr. Alshabkoun's visit to Waterloo, and did not have an opportunity to explain his version of these questioned surgeries to Dr. Alshabkhoun.

On April 26, 1990, the ad hoc appeal committee met to hear Dr. Islami's appeal from the Executive Committee's March 23, 1990 decision to require a second opinion for all his surgeries. The minutes of this meeting can be found in Exhibit 5 beginning at page 233. Dr. Wilson presented the findings of Dr. Hayes, Dr. Sand, Dr. Bolin, and Dr. Waldorf. The fact that there had been an outside review of Dr. Islami's charts was discussed but the results of Dr. Alshabkoun's review were not yet available. Dr. Islami received notice of this hearing, appeared at the hearing, and made a presentation. At the end of the hearing, the committee voted unanimously to deny Dr. Islami's appeal.

On April 27, 1990, the Executive Committee met and upheld its earlier decision to restrict Dr. Islami's privileges by requiring a mandatory second opinion for all surgical procedures (Exhibit 5, p. 241). Dr. Stanford notified Dr. Islami of this decision by letter dated April 27, 1990 (Exhibit 5, p. 246).

On May 9, 1990, the ad hoc committee which was appointed to conclude the focus study of Dr. Islami's 95 surgical charts met to develop a final recommendation (Exhibit 5, p. 249). Dr. Wilson, Dr. Sand, and Dr. Waldorf were present. Dr. Hayes and Dr. Bolin were absent, but participated by telephone. Dr. Wilson again reviewed the manner in which the study had been conducted and explained the role of Dr. Alshabkhoun. Members of the committee unanimously agreed to recommend some type of corrective action regarding Dr. Islami to the Executive Committee. The members unanimously agreed that the review had raised "serious concern" about Dr. Islami. Then, by a three to two vote, the committee recommended immediate suspension of Dr. Islami's privileges. As an alternative, the members unanimously agreed to recommend strict control over Dr. Islami's privileges including: a

100% case review, a co-surgeon for each case, better documentation, a second opinion on all major surgical procedures, and other requirements (Exhibit 5, pp. 252–53). Dr. Hayes and Dr. Bolin entered their votes by telephone. Dr. Islami did not receive advance notice of this meeting.

On May 11, 1990, the Executive Committee met to consider the recommendation for suspension of Dr. Islami's privileges. Again, Dr. Islami was not present nor did the committee notify him about this meeting. Dr. Wilson presented the case for Dr. Islami's suspension. He reported the findings of the internal reviewers and Dr. Alshabkhoun. The minutes of the meeting reflect that "several specific Dr. [Islami] cases were discussed. It was moved and seconded to suspend all of Dr. [Islami's] privileges at Covenant Medical Center." A vote was taken and ten members voted in favor of suspension and two members opposed. Dr. Stanford notified Dr. Islami of the Executive Committee's decision to suspend his privileges by letter dated May 14, 1990, received on or about May 16 or 17, 1990. He was further informed of his right to appeal (Exhibit 5, pp. 259, 262).

The Executive Committee recorded no finding that Dr. Islami posed an imminent danger to the health of patients or any individual prior to suspending his privileges. Dr. Islami was informed of the suspension some time in the week following the Executive Committee vote. He had just completed surgery when he received notice of the decision (Exhibit JJ, p. 3).

On May 23, 1990, Covenant notified Dr. Islami of two things. First, Virginia Holmes, Covenant's Vice President of Medical Staff Services, notified Dr. Islami by letter that Covenant had approved his contract to operate a vascular laboratory at his office (Exhibit 5, p. 266). In addition, Dr. Stanford notified him of his right to appeal the suspension and the rights attendant to that appeal (Exhibit 5, p. 267). He also received a memorandum advising him that his appeal would be heard on June 4, 1990, and listing exhibits to be considered (Exhibit 5, p. 268).

On May 25, 1990, the Executive Committee met and approved the appointment of an ad hoc committee to hear Dr. Islami's appeal. The Executive Committee appointed Dr. Cafaro, Dr. Chung, Dr. Opheim, Dr. Lederman, and Dr. Vandervelde to the ad hoc committee with Dr. Stanford as its chair.

In preparation for the June 4, 1990 ad hoc committee meeting, Dr. Islami took information available to him concerning the charts in question to three outside physicians for their review. Dr. John D. Corson, Professor of Surgery and Director of Vascular Surgery at the University of Iowa, conducted an extensive review of the relevant vascular cases. In his letter of May 29, 1990, Dr. Corson found no evidence to support a claim that Dr. Islami performed a significant number of unnecessary or nonindicated surgical vascular cases. Further, he found no evidence of multiple cases being performed with poor surgical judgment and no evidence of poor communication and disregard for patient understanding.

Dr. Harold A. Tabaie, Assistant Professor of Surgery at the Philadelphia College of Osteopathic Medicine, reviewed the relevant thoracic cases. He supported Dr. Islami's performance in the cases under question. He found no "strong evidence" to support a claim of unnecessary or nonindicated surgical thoracic cases, lack of appropriate communication, use of poor surgical judgment, or other problems.

Finally, Dr. Hooshang Soltanzadeh from the Mid–Iowa Heart Institute in Des Moines, Iowa, reviewed the thoracic surgical cases performed by Dr. Islami. He also criticized the findings which supported Dr. Islami's suspension and he reiterated the words of Dr. Alshabkhoun about punishment, recrimination, and vengeance. Their reports are found at Exhibit 5, pp. 277–290.

On June 4, 1990, the ad hoc appeal committee hearing commenced at 6:00 p.m. All members of the committee were present as were Dr. Islami, Dr. Wilson, and Dr. Waldorf. Dr. Islami addressed the specific cases in question, answered questions from the committee members, and presented additional information from Dr. Corson, Dr. Tabaie, and Dr. Soltanzadeh.

After taking testimony, the ad hoc committee excused the court reporter and went into

executive session. During the executive session, questions arose and the committee wanted some additional testimony. The committee allowed Dr. Wilson and Dr. Waldorf to testify without a reporter or Dr. Islami present.

The ad hoc committee did not decide the case that day. The committee members requested Dr. Stanford contact Dr. Islami's outside consultants. Dr. Stanford spoke with Dr. Soltanzadeh and Dr. Corson on June 5, 1990, and June 7, 1990, respectively.

The ad hoc committee met again on June 11, 1990. Dr. Stanford reported his telephone conversations with Dr. Soltanzadeh and Dr. Corson and his inability to contact Dr. Tabaie. The committee voted unanimously to reinstate Dr. Islami's staff privileges with certain restrictions including a requirement for a second opinion for all surgeries, a 100% review of all of Dr. Islami's records, and a recommendation that the matter be again reviewed by the Executive Committee after one year (Exhibit 5, pp. 302–304).

The Executive Committee again met on June 13, 1990, to discuss Dr. Islami's suspension. The first order of business was to discuss the liability of physicians for their participation in the peer review process. The ad hoc appeal committee had raised this concern earlier and unanimously agreed that no "malice" was evident in any decision of the surgery department or the Executive Committee (Exhibit 5, pp. 302, 305). The primary action taken at the meeting was to secure Dr. Islami's permission to contact his consultants and to determine whether members of the medical staff with cardiovascular and thoracic privileges would be willing to provide a consultation to Dr. Islami if requested to do so. On June 17, 1990, Dr. Stanford received an updated letter from Dr. Corson (Exhibit 5, pp. 310–11). The Executive Committee met on June 22, 1990, and again discussed the status of the Islami suspension.

On July 5, 1990, Dr. Islami wrote to Dr. Stanford and asserted his right under the bylaws to exclude members of the medical staff who are in competition with him from voting on his suspension. In addition, he challenged the propriety of participation in Exec-

utive Committee decision by those who had investigated his case. In the letter, he specifically mentioned Dr. Waldorf, Dr. Connell, and Dr. Wilson. He also informed Dr. Stanford that any restriction on his privileges, including a mandatory second opinion, was unacceptable. (Exhibit 5, p. 322).

On July 6, 1990, the Executive Committee met to consider Dr. Islami's appeal and the recommendation of the ad hoc appeal committee to reinstate his privileges with some significant restrictions. The Executive Committee stated that actions previously taken by the committees were in the interest of patient protection. In a secret ballot, the Executive Committee voted nine to six to uphold the suspension of Dr. Islami's privileges. Dr. Connell and Dr. Waldorf voted at that meeting.

Dr. Stanford informed Dr. Islami of the Executive Committee's decision by letter on July 11, 1990. Dr. Islami exercised his right to appeal to the decision to Covenant's Board of Directors. The board refused Dr. Islami's request to take additional evidence and testimony. The board determined that its main function in the review process was to ensure that Dr. Islami had been treated fairly, not to consider the merits of the suspension. The board felt the medical decision on Dr. Islami's qualifications should to left to the doctors on the Executive Committee. The board did hear testimony from hospital employees about difficulties the Executive Committee experienced in arranging interviews with Dr. Islami's consultants. The transcript of the board hearing indicates that the lack of access to the consultants was a factor in the decision making process. It is unclear whether the members of the Executive Committee ever communicated these concerns to Dr. Islami. The board affirmed Dr. Islami's suspension. Dr. Islami was notified of this decision on August 9, 1990 (Exhibit 5, p. 335).

Dr. Islami now does only a fraction of the surgeries he did before his suspension. Yet, his income has not dropped significantly. In his best year before suspension, his gross income exceeded $500,000. In 1990, his gross income was $426,000. In 1991, his gross income still exceeded $400,000. He still receives referrals and his laboratory still

operates on a limited basis. He remains insured in his practice.

Covenant's bylaws are found in Exhibit 7. Those portions of the bylaws significant to this opinion are noted in the text.

## Discussion

Dr. Islami has moved for summary judgment on the portion of his complaint alleging breach of contract. He argues that Covenant's bylaws constitute a contract between himself and Covenant. He asserts that Covenant breached the contract by failing to follow the procedures outlined in the bylaws for restricting and suspending hospital privileges.

Covenant opposes Dr. Islami's motion for summary judgment on the breach of contract claim. Covenant first contends that the bylaws do not constitute a contractual agreement between Covenant and Dr. Islami. Covenant also argues that even if the court finds that the bylaws are part of a contract with Dr. Islami, there are genuine issues of material fact about whether they followed the procedures outlined in the bylaws for restricting and suspending Dr. Islami's privileges.

Covenant, along with the other defendants, filed their own motion for summary judgment. The defendants ask the court to enter summary judgment in their favor on the portions of Dr. Islami's complaint that defendants have violated federal antitrust law, have intentionally inflicted emotional distress on Dr. Islami, and have intentionally interfered with Dr. Islami's business relationships. The defendants first argue that their motion for summary judgment should be granted on all counts because they are immune from liability under both federal and state laws providing immunity from suit for hospitals and physicians based on their participation in peer review proceedings. The defendants argue that even if they are not entitled to immunity, they are still entitled to summary judgment on the antitrust, intentional infliction of emotional distress, and intentional interference with business relations claims.

Dr. Islami opposes the defendants' motion for summary judgment. Dr. Islami argues that the defendants do not qualify for immu-

nity under either Iowa or federal standards. Dr. Islami also asserts that there are genuine issues of material fact regarding the claims on which the defendants' seek summary judgment.

## I. *Summary Judgment*

The Eighth Circuit recently articulated the following standards governing motions for summary judgment:

> Under Rule 56(c) summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and "by affidavit or otherwise" designate "specific facts showing that there is a genuine issue for trial." *Robinson v. Monaghan,* 864 F.2d 622, 624 (8th Cir.1989) (quoting Fed.R.Civ.P. 56(e)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986). In designating specific facts, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" because Rule 56(c) requires "that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 [106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202] (1986) (emphasis in original). In order to determine which facts are material, courts should look to the substantive law in a dispute and identify the facts which are critical to the outcome. *Anderson v. Liberty Lobby,* 477 U.S. at 248 [106 S.Ct. at 2510].

> A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment. *Id.* In performing the genuineness inquiry, trial courts should believe the evidence of the party opposing summary judgment and all justifiable inferences should be drawn in that party's favor. *Id.* at 255 [106 S.Ct. at 2513]. A court is not "to weigh the evidence and determine the truth of the matter but [instead should]

determine whether there is a genuine issue for trial." *Id.* at 249 [106 S.Ct. at 2511].

When a party opposing summary judgment fails its burden, summary judgment "may and should be granted" if the moving party otherwise satisfies the Rule 56(c) requirements. *Celotex,* 477 U.S. at 323 [106 S.Ct. at 2552]. Summary judgment is not to be construed as a "disfavored procedural short-cut" but should be interpreted to accomplish its purpose of isolating and disposing of factually unsupported claims and defenses. *Celotex,* 477 U.S. at 327 [106 S.Ct. at 2554]. Yet, the Supreme Court also notes that trial courts should act with great caution and may deny summary judgment when it believes "the better course is to proceed to a full trial." *Anderson v. Liberty Lobby,* 477 U.S. at 255 [106 S.Ct. at 2513].

*Commercial Union v. Schmidt,* 967 F.2d 270, 271–72 (8th Cir.1992) (parallel citations omitted). In order to determine if summary judgment is appropriate on any of the claims in this case, the court must look to the law underlying each claim to determine the material facts and if they are in dispute.

## II. *Dr. Islami's Motion for Summary Judgment*

Dr. Islami moves for summary judgment on his breach of contract claim. Dr. Islami asserts that Covenant's medical staff bylaws are a contract between Covenant and its medical staff and that Covenant failed to follow the procedures in the bylaws in restricting and then terminating his hospital privileges. He argues that failure to follow the bylaws is a breach of contract.

Dr. Islami's contract claim is governed by Iowa law. Under Iowa law, to establish a breach of contract claim, a plaintiff must satisfy the following elements:

(1) the existence of the contract; (2) the terms and conditions of the contract; (3) that the [plaintiff has] performed all the conditions of the contract required of [him] . . .; (4) that the contract was breached in some particular way; and (5) that the [plaintiff] has suffered damages.

*Berryhill v. Hatt,* 428 N.W.2d 647, 652 (Iowa 1988); *see also* Iowa Civil Jury Instructions No. 2400.1.

Covenant asserts that as a matter of law Dr. Islami cannot establish the existence of a contract between Dr. Islami and Covenant— the first element of a breach of contract action. Covenant argues that its medical staff bylaws should not be treated as a binding contract between the members of the medical staff and the hospital.

■ The Iowa courts have never directly decided whether a hospital's medical staff bylaws create an enforceable contract with the hospital's medical staff. In *Locksley v. Anesthesiologists of Cedar Rapids, Iowa,* 333 N.W.2d 451, 454 (Iowa 1983), the Iowa Supreme Court found that the district court committed no error in instructing the jury that a hospital had a duty to follow its bylaws in physician disciplinary proceedings. However, the court did not explicitly determine whether the bylaws could be enforced in a contract action.

There is a split of authority in the states which have addressed this issue. Some courts and commentators have concluded that bylaws which are subject to the ultimate authority of the governing board of the hospital do not constitute a binding agreement between the medical staff and the hospital. *See, e.g., Munoz v. Flower Hosp.,* 30 Ohio App.3d 162, 507 N.E.2d 360 (1985); *Todd v. Physicians & Surgeons Comm. Hosp.,* 165 Ga.App. 656, 302 S.E.2d 378 (1983); *Stein v. Tri–City Hosp. Authority,* 192 Ga.App. 289, 384 S.E.2d 430 (1989); *see also* 41 C.J.S. Hospitals § 16 (1991). The majority view, however, appears to be that a hospital's medical staff bylaws constitute a contract between the hospital and the medical staff. *Lewisburg Community Hosp. v. Alfredson,* 805 S.W.2d 756, 759 (Tenn.1991); *Pariser v. Christian Health Care Sys.,* 816 F.2d 1248, 1251 (8th Cir.1987) (interpreting Illinois law); *Posner v. Lankenau Hosp.,* 645 F.Supp. 1102, 1106 (E.D.Pa.1986) (Pennsylvania law); *Lawler v. Eugene Wuesthoff Mem. Hosp. Ass'n,* 497 So.2d 1261, 1264 (Fla.Dist.Ct.App. 1986); *Terre Haute Regional Hosp. v. El–Issa,* 470 N.E.2d 1371 (Ind.App.1984); *Anne Arundel General Hosp. v. O'Brien,* 49 Md. App. 362, 432 A.2d 483 (1981); *St. John's Hosp. Med. Staff v. St. John Regional Med. Center,* 90 S.D. 674, 245 N.W.2d 472, 474–75

(1976); *Joseph v. Passaic Hosp. Ass'n,* 26 N.J. 557, 141 A.2d 18 (1958).

The court finds that the majority view is in accord with Iowa law. Iowa courts have recognized on a number of occasions that organizational bylaws create a contractual relationship between parties. *Swanson v. Shockley,* 364 N.W.2d 252, 255 (Iowa 1985); *Bradshaw v. Wakonda Club,* 476 N.W.2d 743, 745 (Iowa App.1991). In *Bradshaw,* the Iowa Court of Appeals stated that "[i]t is undisputed the articles of incorporation, *bylaws,* and club rules and regulations create a contractual relationship between the parties." 476 N.W.2d at 745 (citing *Swanson* and *Berger v. Amana Society,* 250 Iowa 1060, 1066, 95 N.W.2d 909, 912 (1959)) (emphasis added). This court will follow the majority view and find that Covenant's medical staff bylaws create a contractual relationship with Dr. Islami.

The preamble to Covenant's medical staff bylaws states:

> Recognizing that the best interests of the patients are served by ongoing cooperation between hospital administration, the Medical Staff and the hospital Board of Directors, the Practitioners practicing in Covenant Medical Center hereby organize themselves to carry out the functions delegated to the Medical Staff by the Board of Directors in conformity with these Bylaws, Rules and Regulations, subject to the ultimate authority of the Board of Directors of the Hospital.

This court finds the following observation from the Iowa Supreme Court in reviewing hospital bylaws equally applicable here:

> These [bylaws] disclose an overall intent to supervise and control the activities of the individual members of the staff who, by accepting the [hospital] privileges, have agreed to be bound by the by-laws and rules and regulations.

*Koelling v. Board of Trustees of Mary F. Skiff Mem. Hosp.,* 259 Iowa 1185, 146 N.W.2d 284, 291 (1966). The court finds that the language of the bylaws thus provides the requisite intent of the parties to be bound by the terms of the bylaws.

Covenant argues that in this case, like the *Munoz* case, the bylaws are subject to the ultimate authority of the board of directors.

The *Munoz* court found that in such a situation the board of directors is bound by the bylaws not the hospital and, therefore, there is no mutual obligation and no contract between the hospital and medical staff. 507 N.E.2d at 364–65. Covenant urges this court to reach the same conclusion.

This court is not persuaded. The court already has found that the language in the bylaws indicates that hospital and the staff intended to be bound. Moreover, the preamble language only states that the medical staff's decisions under their delegated authority are subject to the authority of the board. This language in no way indicates that the hospital is not bound by the bylaws. Furthermore, the court does not see a distinction between the board of directors and the hospital.

The court finds that under applicable Iowa law and the weight of authority, Covenant's medical staff bylaws create a contractual relationship between Covenant and Dr. Islami. Having reached that conclusion, the court now must determine if there are any genuine issues of material fact on Dr. Islami's claim that the defendants breached the contract.

■ The bylaws provide at 14.3 that the hospital will only take a professional review action against a practitioner on the medical staff "[a]fter adequate notice and hearing procedures are afforded to the practitioner involved or after such other procedures as are fair to the practitioner under the circumstances." Under bylaw 14.2 a "professional review action" includes a restriction or suspension of the practitioner's hospital privileges. Hence, under the bylaws Covenant could not restrict or suspend Dr. Islami's privileges · absent notice and a hearing or after other procedures which were fair to Dr. Islami under the circumstances.

Dr. Islami's main argument is that Covenant breached the contract by failing to follow the proper procedures when they suspended his privileges. He also has raised some arguments that the defendants breached the contract by failing to follow bylaw procedures prior to restricting his privileges by requiring a second opinion on his surgeries. The court will focus primarily on the arguments and facts relating to suspension,

but will address the arguments relating to the second opinion restriction where applicable.

Dr. Islami first argues that Covenant breached the contract because it both restricted and then subsequently suspended his privileges before he had notice and a hearing. He notes that there is no genuine issue of material fact that Covenant only gave him notice and a hearing after the Executive Committee had taken adverse action against him. He alleges the defendants did not comply with the notice and hearing requirement of bylaw 14.3.

The defendants respond to this argument in two ways. First, they argue that Dr. Islami received both notice and a hearing prior to the time the Executive Committee suspended his privileges. They argue that he received timely notice and a hearing on April 26, 1990. Second, they argue that bylaw 14.5 was invoked in Dr. Islami's case and allowed Covenant both to restrict and then suspend Dr. Islami's hospital privileges before he received notice and a hearing. Bylaw 14.5 provides:

> Nothing in this Bylaw shall preclude an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where failure to take such an action may result in an imminent danger to the health of any individual.

They contend under bylaw 14.5 that giving Dr. Islami notice and a hearing after the initial vote to suspend his privileges was sufficient under the bylaws.

The court finds first Dr. Islami has demonstrated there is no genuine dispute of material fact that he did not receive notice and a hearing prior to either the restriction or suspension of his privileges. Covenant restricted his privileges on March 23, 1990, by requiring him to receive a second opinion on all major surgeries. He did not receive a hearing on the restriction until April 26, 1990. Covenant then suspended Dr. Islami's privileges by a vote of the Executive Committee on May 11, 1990. Dr. Islami received his first notice of the suspension on May 16 or 17, 1990. Dr. Islami did not receive a hearing on the suspension until June 4, 1990.

Covenant asserts that the hearing Dr. Islami received April 26, 1990, on the second opinion requirement satisfied the requirements of bylaw 14.3 that he receive notice and a hearing prior to suspension of privileges. Covenant believes that this hearing at least raises a genuine issue of material fact about whether he had notice and a hearing prior to the suspension. The court rejects these arguments. Bylaw 14.6(A) indicates that the notice a practitioner is to receive should disclose the professional review action proposed and the reasons for the proposed action. There is nothing in the record which even infers that prior to the April 26, 1990, Dr. Islami was notified the Executive Committee was proposing to suspend his privileges. He was notified only that the Committee was recommending that he obtain a second opinion prior to doing surgery. Likewise, the second opinion requirement is all that either he or the Committee addressed at the hearing. There is nothing in this record, even drawing all inferences in the defendants' favor, which indicates that Dr. Islami received notice and a hearing which complied with the bylaws prior to the time Covenant suspended his privileges. Covenant makes no argument that Dr. Islami received a hearing prior to the imposition of the second opinion requirement.

The defendants also argue that they acted both to restrict and then suspend Dr. Islami's privileges pursuant to section 14.5 of the bylaws. Section 14.5 specifically allows the hospital to restrict or suspend clinical privileges prior to providing the practitioner notice and a hearing where the failure to act could result in imminent danger to patients. The defendants point out that the bylaws which apply to the emergency suspension of privileges are found in sections 13.21–13.24. They contend that they followed all of the applicable guidelines both in restricting and then suspending Dr. Islami.

The question of whether there was imminent danger, making section 14.5 and sections 13.21–13.24 applicable, presents a genuine issue of material fact. The defendants assert that the record demonstrates that their action were based on imminent danger to patients. The defendants specifically

point to the testimony of Dr. Stanford at the June 4, 1990 ad hoc committee meeting where he stated that the situation presented "a serious patient well being problem and in cases such as that" immediate suspension was allowed under the bylaws. Dr. Islami argues that there was no imminent danger to his patients that justified suspension.

Dr. Islami points to several events in the record which belie the defendants' assertion of imminent danger. He points out that the Executive Committee made no finding on imminent danger before either restricting or suspending his privileges. He also points out that Dr. Stanford lifted the second opinion requirement pending outcome of the appeal on that restriction. He also notes that the Committee did not communicate his suspension to him until at least 5 days after it occurred, allowing him to operate during the intervening time period. Hence, he argues the defendants' assertion that they suspended his privileges under bylaw 14.5 simply are not credible.

Dr. Islami makes a persuasive case on this point. The court, however, is not persuaded that there is no genuine issue of material fact on the question of imminent danger and the applicability of bylaw section 14.5. While the defendants' evidence on this point is not strong, the assertions of imminent danger by Dr. Stanford creates a jury question.

Yet, even assuming for the purposes of argument that the defendants properly proceeded in both summarily restricting and suspending Dr. Islami's privileges under section 14.5, the bylaws still entitle Dr. Islami to a fair hearing. Section 14.3 requires the hospital to provide subsequent notice and hearing in compliance with section 14.6 of the bylaws or to provide other procedures which are fair to Dr. Islami under the circumstances before the suspension could become final. The record before this court indicates Dr. Islami did not receive an adequate hearing on his suspension under the guidelines of bylaw section 14.6.[2]

There is no dispute in the record that after the June 4, 1990 hearing had ended, the ad hoc appeals committee dismissed the court

reporter and retired to consider the evidence in executive session. Questions arose during the deliberations and the hearing panel requested Dr. Wilson and Dr. Waldorf to provide additional information. Both Dr. Wilson and Dr. Waldorf testified before the hearing panel without a court reporter or Dr. Islami present. Dr. Islami obviously was not given the opportunity to cross examine the testimony of Dr. Wilson or Dr. Waldorf. Section 14.6(E)(iii)(c) requires the hearing panel to allow Dr. Islami to cross-examine witnesses. Section 14.6(E)(v) requires an accurate record of the hearing. Section 14.6(E)(vi) requires the physical presence of Dr. Islami at the hearing. The court finds that even drawing all reasonable inferences in favor of the defendants, the above sections of the bylaws were not followed and, therefore, Dr. Islami did not receive a hearing in compliance with section 14.6.

The defendants argue that because Dr. Waldorf and Dr. Wilson appeared at the hearing and Dr. Islami did not call them as witnesses that he waived his right to cross examine them. The defendants point the court to section 14.6 generally to support this assertion. The court finds nothing in section 14.6 to support this argument. To the contrary, the court finds section 14.6(E)(iii)(c) provides for an unqualified right to cross-examine witnesses. The defendants contend that Dr. Islami had other opportunities to respond to any information offered by Dr. Wilson or Dr. Waldorf. The defendants imply that because Dr. Islami appeared again before the hearing panel, on June 11, 1990, before the panel reached its decision, Dr. Islami effectively had the chance to answer to the information provided by Dr. Wilson and Dr. Waldorf. The defendants also argue that Dr. Islami eventually received the minutes of their testimony and that he had the chance to respond to what they said. The court does not find this to be a suitable replacement for cross examination. These arguments about cross examination also fail to address the fact the hospital did not follow section 14.6(E)(iv) & (v).

---

2. Dr. Islami does not argue that the hearing he received subsequent to the imposition of the second opinion requirement is deficient in any way.

The arguments about the deficiency of the hearing relate exclusively to the hearing on the suspension.

The defendants argue that even if they did not follow the bylaws in every technical respect, it is enough if they substantially complied with the bylaws. They contend that judicial review of medical staff privilege decisions is limited to whether the defendants have substantially complied with the medical staff bylaws. *Friedman v. Memorial Hosp. of South Bend,* 523 N.E.2d 252 (Ind.App. 1988); *Keskin v. Munster Medical Res. Found.,* 580 N.E.2d 354, 359 (Ind.App.1991); *Even v. Longmont United Hosp. Association,* 629 P.2d 1100, 1102 (Colo.App.1981). The Iowa courts have never applied this standard to these types of cases. *See Locksley v. Anesthesiologists of Cedar Rapids, Iowa,* 333 N.W.2d 451, 454 (Iowa 1983) (Iowa courts do not review merits of hospital's decision to revoke staff privileges but only "whether the hospital complied with due process before revoking staff privileges" but Court did not acknowledge a substantial compliance standard).

This court, however, need not determine if Iowa law requires a substantial compliance exception. The defendants have argued that the critical test in applying the substantial compliance standard essentially becomes whether the procedures provided the physician were fundamentally fair. The bylaws themselves already require the court to make such a determination. Section 14.3 of the bylaws provides for notice and a hearing under 14.6 or "other procedures as are fair to the practitioner under the circumstances." The court reads this provision to require the same inquiry defendants advocate under the 'substantial compliance' rubric.

The critical issue in Dr. Islami's motion for summary judgment becomes whether the procedures the defendants afforded to Dr. Islami were fair under the circumstances. The court finds that this issue saves the defendants from summary judgment because it creates a genuine issue of material fact for the jury to decide. The court believes that "fairness based on the circumstances" is the paradigm jury question. The parties have

diametrically opposed views on the issue and believe that the factual record viewed as a whole supports their position. This is an issue for the jury to decide.[3]

### III. *Defendants' Motion for Summary Judgment*

The defendants have moved for summary judgment on all the remaining causes of action pleaded by Dr. Islami in this case. The defendants first argue that they are immune from liability on all counts of the complaint under the Federal Health Care Quality Improvement Act (42 U.S.C. §§ 11101–11152) as well as under immunity provisions in Iowa law found at *Iowa Code* § 147.135. The defendants next argue that even if they are not entitled to immunity, summary judgment is nonetheless appropriate on the merits of the other claims. The defendants assert that summary judgment is appropriate on the antitrust complaint, the intentional infliction of emotional distress complaint, and the intentional interference with business relations complaint. The court will address separately each of the grounds for summary judgment asserted by the defendants.

### A. *Immunity*

(1) Federal Health Care Quality Improvement Act (HCQIA)

■ The defendants assert that they are entitled to summary judgment based on the immunity provided in HCQIA for doctors and hospitals for their participation in professional peer review proceedings. The relevant portion of the immunity provision states:

(1) **Limitation on damages for professional review actions**

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—

---

3. The defendants also have argued that Dr. Islami is not entitled to summary judgment on his breach of contract claim because Dr. Islami breached the agreement first when he failed to provide professional medical care as provided under the bylaws. The court need not reach that

issue here as it already has found that there are genuine issues of material and that summary judgment is not appropriate. Moreover, at a minimum there are genuine factual issues about whether Dr. Islami breached the bylaws at all.

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or formal agreement with the body, and

(D) any person who participates with or assists the body with respect to this action,

shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. . . .

42 U.S.C. § 11111(a). There is no dispute that this case involves a professional review action as defined in § 11151(9). The standards of § 11112(a) which must be satisfied for the purposes of § 11111(a) immunity provide:

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a). Dr. Islami argues that the procedures which the defendants provided did not satisfy subsection (3) of section 11112(a). The question becomes whether Dr. Islami received an adequate notice and hearing or other procedures were fair under the circumstances. The applicable standards for adequate notice and hearing are provided at section 11112(b) which states:

(b) Adequate notice and hearing

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating—

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)—

(A) subject to subparagraph (B), the hearing shall be held (as determined by a health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right—

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

(c) Adequate procedures in investigations or health emergencies

For purposes of section 11111(a) of this title, nothing in this section shall be construed as—

(1) requiring the procedures referred to in subsection (a)(3) of this section—

(A) where there is no adverse professional review action taken or

(B) in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action; or

(2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.

42 U.S.C. § 11112(b) & (c).

The immunity provided in the HCQIA is a limited immunity from liability in actions for damages only. 42 U.S.C. § 11111(a)(1); *see also* H.R.Rep. No. 903, 99th Cong., 2d.Sess. 10, reprinted in 1986 U.S.Code Cong. & Admin.News 6287, 6384, 6394. The immunity does not extend to actions for injunctive relief. Here, Dr. Islami has asked for damages on all counts and injunctive relief in the form of reinstatement should he prevail in his breach of contract count.

The immunity provisions outlined in the HCQIA are relatively new in the law. There is very little precedent guiding their implementation. There are, however, a couple of recent cases which provide some insight on how the standards should be applied at the summary judgment stage of a case.

In *Austin v. McNamara,* 979 F.2d 728, 733 (1992) the Ninth Circuit decided that the question of immunity could be determined at summary judgment. *Austin* found that a somewhat nontraditional standard for summary judgment applied in immunity cases under HCQIA. The *Austin* court found that because § 11112(a) provides a rebuttable presumption of immunity the summary judgment inquiry is best stated as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)." *Austin* indicates that while immunity may be determined at the summary judgment stage, it also may be left for trial if the standard cannot be satisfied.

The *Austin* court's articulation of the summary judgment standard for immunity determinations under HCQIA differs from another recent articulation of the standard in *Fobbs v. Holy Cross Health System Corp.,* 789 F.Supp. 1054, 1063–65 (E.D.Cal.1992). In *Fobbs,* the court found that the question of immunity under HCQIA is a question of law for the court to decide. *Id.* at 1066. *Fobbs* found that the HCQIA immunity is mostly

closely analogous to the immunity afforded to government officials facing 42 U.S.C. § 1983 actions. *Fobbs* subscribed to the test enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Fobbs* noted that *Harlow* provided for an objective test for courts to determine whether summary judgment was appropriate. *Fobbs* also concluded that the legislative history to the HCQIA indicated that Congress intended to adopt such an objective test for immunity determinations under HCQIA as well. *Fobbs* adopted the objective test for making the immunity determination at the summary judgment stage in cases under the HCQIA.

This court need not definitively determine which summary judgment standard should apply here because under either test, the defendants are not entitled to summary judgment on the basis of the HCQIA immunity. The standards for adequate notice and hearing outlined in section 11112(b) & (c) track very closely, if not identically in most places, with the standards for adequate notice and hearing under the Covenant's medical staff bylaws. In one of Covenant's Executive Committee meetings counsel for the hospital indicated that the bylaws had been specially rewritten to conform with the HCQIA. The court believes that if the peer review proceeding had followed the bylaws, then there would be no doubt that defendants would be entitled to immunity in this case.

As the court concluded earlier, on the factual record here, the defendants did not afford Dr. Islami the notice and hearing procedures outlined in the bylaws. Likewise then, the court finds, under either the *Fobbs* or the *Austin* standards, the defendants did not provide Dr. Islami adequate notice and hearing under the terms of 42 U.S.C. § 11112(b) or (c). Hence, the defendants are not entitled to summary judgment on the immunity issue on the basis that they provided adequate notice and a hearing under section 11112(b) or (c).

Yet, like the bylaws, section 11112(a) provides that in lieu of adequate notice and a hearing under section 11112(b), other procedures which are fair under the circumstances will also satisfy the immunity statute. § 11112(a)(3); *see also* § 11112(b) (failure to comply with every technical provision of subsection (b) does not necessarily mean that 11112(a)(3) has not been satisfied). The immunity question, like the breach of contract question, comes down to whether the defendants provided Dr. Islami other procedures which were fair under the circumstances.[4] The only difference between the contract and the immunity questions on the question of "fairness of the procedures under the circumstances" is that different summary judgment standards are used to determine if the defendants are entitled to immunity.

As noted above, the standards in *Austin* for determining the availability of immunity at summary judgment account for the rebuttable presumption of immunity in section 11112(a). Under those standards, to escape summary judgment on a finding of immunity, Dr. Islami must demonstrate that a reasonable jury could find that he has shown by a preponderance of the evidence that the defendants did not provide him with fair and adequate process under the circumstances. For the same reasons that the court denied Dr. Islami's motion for summary judgment on the contract claim, the court finds under *Austin* Dr. Islami has provided a sufficient showing to create such a factual question and defeat the defendants' motion for summary judgment.

The court would reach the same conclusion applying the *Fobbs* analysis. *Fobbs* found that immunity questions are questions of law for the court and that courts should follow the 42 U.S.C. § 1983 qualified immunity analysis in addressing these questions. In section 1983 cases, the favored approach is to have the immunity determination made by

---

4. The court notes here that if it decided that the procedures provided to Dr. Islami were fair under the circumstance and granted summary judgment on the immunity issue, that effectively would decide the entire case. That finding would give the defendants immunity from liability on the damages claims raised under the breach of contract action, the antitrust law action, the intentional infliction of emotional distress action, and the intentional interference with a business relation action. Likewise, a finding that the procedures were fair under the circumstances would effectively conclude that the procedures were sufficient under the contract as well and that Dr. Islami could not continue to pursue his reinstatement claim.

the court, prior to trial, whenever possible. *Johnson v. Hay*, 931 F.2d 456, 459 (8th Cir. 1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (qualified immunity is "an *immunity from suit* rather than a mere defense to liability [which] is effectively lost if a case is erroneously permitted to go to trial")).

Immunity questions in section 1983 cases are *ordinarily* questions of law for the court to decide, not the jury. *Gainor v. Rogers*, 973 F.2d 1379, 1383 (8th Cir.1992) (citing *Hunter v. Bryant*, —— U.S. ——, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). However, if the court finds that a dispute of fact exists about an issue critical to the immunity determination, then "the defense of qualified immunity shielding the defendant from trial must be denied." *Gainor*, 973 F.2d at 1385.

Here, there is a genuine issue of material fact regarding whether the procedures were fair to Dr. Islami under the circumstances. There are voluminous arguments from both parties giving their accounts of how the procedures were fair and unfair. The court observes that the fairness question addresses the adequacy of the proceedings given all of the circumstances. The factual circumstances are complicated and hotly disputed in this case. For the court to say whether the proceedings were fair in the circumstances at this juncture would require the court to draw numerous inference and weigh the evidence of the parties; a process which is anathema to summary judgment decisions.

The court concludes that under either the *Austin* or the *Fobbs* summary judgment analysis the defendants are not entitled to immunity. The question still remains, however, whether to deny immunity outright or to allow it to remain in issue through the trial. The Eleventh Circuit has found that the 1983 immunity determination may be made before, during, or after the trial. *Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir.1992). The *Stone* court notes the same preference that the court should ordinarily determine the immunity issue at the earliest possible time and that the jury should never be instructed on immunity and allowed to decide the issue. The *Stone* case concluded that the district court, not the jury, must determine entitlement to immunity. In performing that analysis:

If it determines that the defendants are not entitled to qualified immunity, then the merits of the case should be submitted to the jury without reference to the qualified immunity issue ... If there are disputed issues of fact concerning qualified immunity that must be resolved by a full trial and which the district court determines that the jury should resolve, special interrogatories would be appropriate.

*Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir.1992). This court believes that this is the most appropriate method for resolving the immunity question. The court will allow the jury to answer the question of whether the procedures which the defendants afforded to Dr. Islami were fair given the entire factual circumstances in this case.

This court is aware that in *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) the Supreme Court frowned on leaving to the jury factual questions which would be dispositive on qualified immunity questions. However, the Supreme Court observed that these questions should not *routinely* be left for the jury and *ordinarily* should be decided by the court. —— U.S. at ——, 112 S.Ct. at 537. This is far from a per se prohibition on allowing the jury to decide some critical factual issues. This court believes that this case in many respects is the type of extraordinary case that the Supreme Court contemplated when the Court said that *ordinarily* the immunity determination is a question of law for the court. The Court implies that the extraordinary case still may go to the jury for some help. This case is extraordinary because the decision on immunity is hopelessly intertwined with a decision on the merits of the contract claim which this court already has found cannot be decided by summary judgment.

The defendants argue strenuously that the court should provide immunity to the defendants and grant the defendants' motion for summary judgment. The defendants take the position that failure to grant summary judgment will chill the doctors' willingness to participate in the peer review process and, consequently, jeopardize the quality of patient care. The court is not unsympathetic

to that concern and recognizes that Congress has clearly enunciated a policy of encouraging peer review by enacting the immunity provisions of the Health Care Quality Improvement Act.

That act also recognizes, however, that suspension of a doctor's staff privileges can have a devastating effect upon a medical professional. Consequently, the act has set up specific procedural safeguards which must be given to the doctor before the hospital and physician members of the peer review process are afforded the benefits of the immunity provisions. This court cannot say as a matter of law that the peer review process in this case accorded Dr. Islami all of the due process rights to which he is entitled. Consequently, this matter will have to be submitted to a jury.

While the court does not relish the prospect of possibly chilling the peer review process, the court will also note that this is not a case where the hospital was not given an opportunity to correct the shortcomings in the peer review process as it progressed. Certainly, Dr. Islami gave the Executive Committee notice of the fact that he was protesting participation in the decision making by persons who arguably were his economic competitors. Even more importantly, the Covenant Board was put on specific notice of the deficiencies in the process, yet, chose to proceed and ratify the decision to suspend Dr. Islami's privileges. Quite possibly, this whole lawsuit could have been avoided had the board done as the review committee did in the *Fobbs* case, and sent the matter back to the Executive Committee to comply strictly with the by-law provisions and due process requirements of HCQIA. 789 F.Supp. at 1058. A jury may ultimately determine that Dr. Islami received a hearing that was "fair under all the circumstances" and immunity will be imparted to the doctors and hospital. However, their failure to carefully follow the by-laws and HCQIA generates a jury issue.

### (2) Immunity under the Iowa Code

The defendants also argue that they are entitled to immunity under *Iowa Code* § 147.135 which provides:

A person shall not be civilly liable as a result of acts, omissions or decisions made in connection with the person's service on a peer review committee. However, such immunity from civil liability shall not apply if an act, omission or decision is made with malice.

The Iowa immunity provision purports to provide an even broader immunity than the federal grant of immunity under the HCQIA. This provision arguably provides absolute immunity from all civil liability and, therefore, all of Dr. Islami's causes of action. The court, however, finds that the immunity provided under Iowa law is not available to the defendants at summary judgment.

■ The court first notes that the Iowa immunity provision does not entitle the defendants to immunity from federal antitrust liability. *Quinn v. Kent General Hosp., Inc.*, 617 F.Supp. 1226, 1240 n. 11 (D.Del.1985). The *Quinn* court noted, and this court agrees, "that in the absence of state action or express federal statutory exemption federal antitrust law will preempt state law to the extent that the latter conflicts with it." *Id.*; *see also Fobbs,* 789 F.Supp. at 1070 (noting that state law does not apply to questions of immunity from federal claims under the Sherman Antitrust Act).

■ As *Quinn* noted, however, there is an exception when the statute purports to convey state action immunity. The Supreme Court held long ago that the federal antitrust laws were "not intended 'to restrain state action or official action directed by a state.'" *Patrick v. Burget,* 486 U.S. 94, 99, 108 S.Ct. 1658, 1662, 100 L.Ed.2d 83 (1988) (quoting *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)). The state action immunity rationale has been extended to certain suits against private parties. *Patrick,* 486 U.S. at 99–100, 108 S.Ct. at 1662. The Court has limited private parties to immunity "only when their anticompetitive acts were truly the product of state regulation." *Id.* Private parties must establish the following two-prong test to achieve that immunity:

First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy.... Second, the anticompetitive conduct must be actively supervised by the State itself.

*Id.* at 100, 108 S.Ct. at 1663 (citations omitted). "Only if an anticompetitive act of a private party meets both of these requirements is it fairly attributable to the State." *Id.*

Here, this court has found no clear articulation in the Iowa law that peer review proceeding or professional review proceedings, the challenged restraints in this case, are mandated by Iowa law. Moreover, the court does not believe that the state has actively supervised the peer review process in this case. The actively supervised prong of the test requires that "the State exercise ultimate control over the challenged conduct." *Id.* at 101, 108 S.Ct. at 1663. Stated another way state officials must "have *and exercise* power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.* (emphasis added). Here, there is nothing in the record which indicates that the state exercised any power over this proceeding. This case is very much like *Patrick.* The state of Iowa exercised no control over the peer review proceedings in this case. Even the availability of judicial review in the Iowa courts is limited to questions of fairness of procedure, not addressing the merits of the professional review action. *Locksley,* 333 N.W.2d at 454. This is not enough under *Patrick* to create state action. 486 U.S. at 104–05, 108 S.Ct. at 1664–65.

■ There also is a genuine issue of material fact under the immunity statute itself. The issue is whether the defendants acted with malice. Dr. Islami points to numerous places in the record which he contends reflect malice or at least infer malice. He points in particular to Dr. Alshabkhoun's letter to the committee warning that punishment here would be "punishment, recrimination, vengeance, . . . ." He then points to places in the record indicating that Dr. Alshabkhoun's recommendations may have been misrepresented to the decisionmakers. Further, the comment made by Dr. Connell that there would be blood flowing in the halls if Dr. Islami's lab was not removed would be additional evidence which could infer malice.

The defendants likewise have pointed to evidence unequivocally stating that no malice was present and other evidence inferring there was no malice. At one hearing, late in

the process, the committee specifically made a finding that they were acting without malice throughout the process. The defendants also point out the numerous statements that patient well being was the only reason for the action, as implying that there was no malice present.

The court finds that this question, like the question of fairness in the HCQIA immunity determination, must be left to the jury. The court concludes that immunity under the *Iowa Code* is not available to the defendants at summary judgment.

### B. *Antitrust*

The defendants ask the court to grant summary judgment on Dr. Islami's federal antitrust claim under section 1 of the Sherman Act. That section provides:

> Every contract, combination in the form of a trust or otherwise, or conspiracy, in the restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony.

15 U.S.C. § 1. To prevail under section 1, Dr. Islami must prove both an illegal contract, combination, or conspiracy and that it resulted in an unreasonable restraint on trade.

The defendants assert that Dr. Islami is unable to make a sufficient showing either on the factual record or as a matter of law to survive summary judgment on his antitrust claim. The Supreme Court provided the standards for summary judgment in antitrust cases in *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To survive a motion for summary judgment the party alleging an antitrust violation "must establish that there is a genuine issue of material fact as to whether [the defendants] entered into an illegal conspiracy that caused [the plaintiff] to suffer a cognizable injury." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Here, the defendants allege not only that Dr. Islami is unable to establish a genuine issue about whether the defendants entered into an illegal conspiracy,

they also argue that he is incapable of showing that they acted in an illegal conspiracy as a matter of law. The defendants also argue that Dr. Islami has not established a genuine issue of fact about whether there is a cognizable injury which restrained trade.

### (1) Conspiracy

#### (a) *Capacity to Conspire*

■ The defendants argue that a hospital and its medical staff are incapable of conspiring in the peer review process. They contend that the hospital and its medical staff are acting as one unitary entity when they perform peer review and, therefore, they should be treated under the intracorporate immunity doctrine announced in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The *Copperweld* Court concluded that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." *Id.* at 769, 104 S.Ct. at 2741. The *Copperweld* court reached that conclusion after making the following observations:

> Section 1 of the Sherman Act, . . . reaches unreasonable restraints of trade effected by a contract, combination or conspiracy between *separate* entities. It does not reach conduct that is wholly unilateral. . . .

> The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. . . .

> The distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms contract, combination, or conspiracy in § 1. Nothing in the literal meaning of those terms excludes coordinated conduct among officers or employees of the *same* company. But it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreement among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Copperweld*, 467 U.S. at 768–69, 104 S.Ct. at 2740–41 (citations omitted) (emphasis in the original).

The defendants urge this court to follow the lead of the Circuit Courts which have extended this intracorporate immunity rationale to the hospital peer review process and concluded that a hospital and its medical staff are incapable of conspiring under § 1 while engaging in peer review. *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Nurse Midwifery Associates v. Hibbet*, 918 F.2d 605 (6th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991); *Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96 (3rd Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); *Weiss v. York Hosp.*, 745 F.2d 786 (3rd Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). The theory in these cases is essentially that the medical staff is functioning as the hospital's agent when it carries out the peer review process. *Oksanen*, 945 F.2d at 703; *Nurse Midwifery*, 918 F.2d at 613–14. The Circuits Courts are split on this question, however. The Eleventh and the Ninth Circuits have determined that the intracorporate immunity doctrine does not appropriately extend to the relationship of the hospital and its medical staff. *Bolt v. Halifax Hosp. Med. Ctr.*, 851 F.2d 1273 (11th Cir.1988) (vacated then fully reinstated by en banc decision *Bolt v. Halifax Medical Center*, 874 F.2d 755 (11th Cir. 1989)), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir.1988) (finds *Bolt* more persuasive). The parties ask this court to determine which of these analyses apply in this case as the Eighth Circuit is yet to address the issue.

This court need not determine which analysis applies. Even if the court assumed, *arguendo*, that the Eighth Circuit would extend the intracorporate immunity doctrine to a hospital and medical staff performing peer review functions, the inquiry would not end there. The Eighth Circuit, and most other courts, have recognized an exception to the intracorporate immunity doctrine when the agents have a personal stake involved. *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir.1986); *Victorian House, Inc. v. Fisher Camuto Corp.*, 769 F.2d 466, 469 (8th Cir.1985); *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 917 (8th Cir.1976) (citing *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974) and *Johnston v. Baker,* 445 F.2d 424, 427 (3rd Cir.1971)). In *Victorian House,* the Eighth Circuit stated the exception as follows: "We have held that a corporation cannot engage in an antitrust conspiracy with its agent unless, at the time of the conspiracy, the agent is acting for his own benefit." 769 F.2d at 469. The *Victorian House* case went on to point out that the plaintiff in an antitrust action must present "sufficient evidence that [the agent] was acting in furtherance of his personal interests" for the exception to apply. *Id.; see also Pink Supply,* 788 F.2d at 1317–18 (focussed on whether plaintiff offered sufficient evidence of personal benefit).

In *Pink Supply* the court further defined the exception as follows: "We construe 'for the agent's own benefit' to mean at least an economic stake in the gain to be realized from the anticompetitive object of the conspiracy." 788 F.2d at 1318. The *Pink Supply* decision also indicates · that when an agent is in direct competition with the plaintiff, the agent can be said to have a direct economic stake in adverse action against the plaintiff. 788 F.2d at 1318 n. 4 (citing *Victorian House,* 769 F.2d at 468–69). Hence, the court finds that sufficient evidence of a Covenant medical staff member's direct competition with Dr. Islami would indicate that the personal benefit exception to intracorporate immunity should apply.

Here, there is sufficient evidence in the record to raise a genuine issue of material fact about whether members of the medical staff performing the peer review of Dr. Islami were acting for their own personal benefit. In particular, the record shows that both Dr. Connell and Dr. Waldorf may be considered to be in direct economic competition with Dr. Islami. Dr. Connell is a competitor in the area of laboratory services. Dr. Waldorf could be considered a competitor in the area of thoracic surgery. While the defendants have noted that Dr. Waldorf practices very little in the area of thoracic surgery, he does advertise his thoracic surgery capability and otherwise hold himself out as a capable thoracic surgeon. At a minimum, the court believes that there is a jury question here about whether Dr. Connell and Dr. Waldorf were acting in furtherance of their own personal interests through their participation in the peer review. .

This court is aware that in *Oksanen,* the Fourth Circuit refused to extend the personal benefit, or personal stake, exception to that particular case, 945 F.2d at 705, and that the Sixth Circuit refused to follow other circuits in adopting the personal stake exception in *Nurse Midwifery.* 918 F.2d at 615. *Nurse Midwifery* has little persuasive value since the Eighth Circuit has adopted the exception.

As to *Oksanen,* this court first notes that the Fourth Circuit did not find a per se rule that the personal stake exception was inapplicable to hospital peer review proceedings. The *Oksanen* court found that the personal stake exception did not apply to the facts of that particular case. Moreover, the *Oksanen* case can be distinguished factually from this case. In *Oksanen,* the Fourth Circuit found that only one member of the medical staff could be said to be in competition with Dr. Oksanen. That member of the staff joined the staff well after the initiation of peer review proceedings against Dr. Oksanen and never even took part in the proceedings. The Fourth Circuit found that these circumstances did not justify the exception.

This case is very different. As noted above, and in the factual record, Dr. Connell and Dr. Waldorf were both arguably competitors of Dr. Islami and participated throughout the entire peer review proceeding.

In *Oksanen,* the Fourth Circuit also pointed out that the medical staff could not inde-

pendently impose the restraint upon the plaintiff without the hospital's approval. The *Oksanen* court observed that the role of the medical staff was to recommend the discipline to the hospital board and that the medical staff did not have sufficient ability to control the decision. The court then observed "[t]o give advice when asked by the decisionmaker is not equivalent to being the decisionmaker itself." *Id.* at 705 (quoting *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 745 F.2d 248, 259 (3rd Cir.1984)). Hence, any personal stake or interest would be irrelevant.

This case again is distinguishable. The Covenant by-laws provide the medical staff, through the Executive Committee, had the ability to make staff privileges decisions. The Executive Committee exercised that ability in this case. Under the by-laws, a physician can appeal such an Executive Committee decision to Covenant's Board of Directors, but that appeal is not required to make the decision final or give it force. In other words, the Executive Committee had final decisionmaking power as final review by the board was available but not mandatory. Hence, the medical staff through the Executive Committee had the ability to implement any illegitimate purpose they may or may not have had.[5]

Even if the court were further to assume that the personal stake exception did not apply and that doctors and hospitals are indeed incapable of conspiring, that still would not end the antitrust inquiry in this case. The case law is in agreement that medical staff doctors are capable of conspiring with each other in the peer review process. Even the *Oksanen* court agrees:

> We recognize that a medical staff can be comprised of physicians with independent and at times competing economic interests. As a result, when these actors join together to take action among themselves, they are unlike a single entity and therefore they may have the capacity to conspire as a matter of law.

945 F.2d at 706; *see also Weiss,* 745 F.2d 786, 815–16 (for extensive reasoning supporting this conclusion). The *Oksanen* court, however, again noted that this conspiracy is not very meaningful when the medical staff did not have the ability to carry out the antitrust restraint it allegedly sought to impose. 945 F.2d at 706; *see also Pudlo v. Adamski,* 789 F.Supp. 247, 251–52 (N.D.Ill. 1992). The *Weiss* court took a somewhat different approach on this issue. The *Weiss* court found that the medical staff could impose the restraint when it really controlled the proceedings and the board's review was of a limited nature. 745 F.2d at 819 n. 57; *see also* P. Areeda, *Antitrust Law* ¶ 1471(h) (stating that the key is whether medical staff had ability to coerce or unduly influence the decision).

As this court just found, the medical staff had the ability and authority to impose the alleged antitrust restraint here. Moreover, even if the court focussed on the staff's ability to coerce or unduly influence the decision, the court would find that is present here. The Executive Committee had the ability to influence the board in this case because Covenant found itself in the unique position of competing with Dr. Islami for laboratory revenue in this case. In this type of case, unlike *Oksanen,* the hospital could be susceptible to undue influence. Further, Dr. Islami has pointed to the Dr. Lederman's testimony that the surgery department, to which Dr. Waldorf belongs, and the radiology department, to which Dr. Connell belongs, have especially powerful influence with the hospital. Again, it becomes a factual question of whether Covenant was or could have been unduly influenced or coerced by Dr. Waldorf or Dr. Connell's wishes. However, the court believes that it is relatively clear that the activity of the defendant doctors themselves is subject to antitrust analysis. Whether the case is actually proved is another question.

(b) *Evidence of Conspiracy*

■ The issues about capacity to conspire aside, Dr. Islami still bears the burden of

---

5. The extent of the review performed by Covenant's Board of Directors of the Executive Committee's decision in this case provides further evidence of the Executive Committee's decisionmaking power in this case. The Covenant Board

of Directors specifically noted that it was not going to review the merits of the case or take any additional evidence. Instead, the board limited its review to the question of fair process only.

providing evidence that there is a genuine issue of material fact about whether the defendants entered into an illegal conspiracy that caused Dr. Islami a cognizable injury. *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. at 1355. Dr. Islami must produce specific facts which show or infer the existence of a conspiracy. *See id.* at 587, 106 S.Ct. at 1356. Here, Dr. Islami relies on the inference of conspiracy as there is no explicit evidence in the record of the defendants' agreement to work against Dr. Islami. *Matsushita* recognized that while inferences under Rule 56 standards should be drawn in favor of the nonmoving party, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* at 588, 106 S.Ct. at 1356. The Supreme Court also instructed that "courts should not permit factfinders to infer conspiracies when such inferences are implausible ..." *Id.* at 593, 106 S.Ct. at 1359 (citation omitted). Along those lines the Eighth Circuit has observed that "[a]n inference of conspiracy is not warranted where the conduct is at least as consistent with legitimate business decisions as with anticompetitive joint action." *Central Telecommunications v. TCI Cablevision,* 800 F.2d 711, 727 (8th Cir.1986) (quoting *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 884 (8th Cir.1978)); *see also Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356 (inference of conspiracy not warranted when it makes no economic sense). *Matsushita* further instructs that a plaintiff seeking to avoid summary judgment "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)).

Here, the defendants contend that any inferences of conspiracy are implausible. They note that the inferences to be drawn from their decision to take peer review action against Dr. Islami demonstrate the peer review was more likely a business decision than an illegal agreement. They cite the *Oksanen* court's observation that illegal peer review would drive out good doctors who would take their business to competing hospitals. 945 F.2d at 704–05. They believe that *Oksanen* correctly observed that a hospital would be motivated to exclude a physician from its medical staff only if that physician's conduct or medical competence was below acceptable standards. *Id.* They conclude, along with *Oksanen,* that the peer review process actually heightens competition because the process helps hospitals retain and enhance reputations for delivery of quality care.

Dr. Islami responds by pointing out that the defendants' arguments and the *Oksanen* decision do not account for the full range of facts in this case. Dr. Islami points out that the above arguments do not account for cases like this one where the doctor is competing directly with the hospital in other areas; the diagnostic lab area in this case. Dr. Islami asserts that the hospital had a motive to take action against Dr. Islami for anticompetitive reasons and did so in this case.

Dr. Islami argues that he opened his lab and immediately drew off business from the hospital lab because he initially provided safer and less costly tests. When the hospital lab acquired equipment to do the same tests, Dr. Islami still provided stiff competition. Dr. Islami argues that this competition to the hospital and the doctors running the lab (Dr. Connell) caused a great deal of concern. He contends that this concern eventually lead the hospital to join with Dr. Connell to take action to restrict access to his lab.

Dr. Islami argues that the defendants first pushed the hospital Executive Committee to establish an ad hoc committee to look into the problem of competition from non-hospital run labs. He asserts that the defendants eventually moved the Executive Committee to adopt a hospital policy to permit use of his lab only when the test needed was not available in the hospital lab. He contends that these facts provide an inference that Covenant and Dr. Connell conspired to use the peer review process to further decrease, or even eliminate the competition from his lab. Dr. Islami points out that without privileges he was foreclosed from receiving patient referrals from Covenant which would substantially reduce his access to the market. The court finds that Dr. Islami has raised specific enough facts to create a genuine issue for the jury about whether Covenant and Dr. Connell agreed to use measures, including the

peer review process, to eliminate competition from Dr. Islami.

The inference that Dr. Waldorf joined and participated in the conspiracy comes from the fact that Dr. Waldorf, who performs some thoracic surgery, could be considered a competitor and would stand to benefit from eliminating Dr. Islami's competition at Covenant. To overcome the competing inference from *Matsushita* that Dr. Waldorf was acting independently in performing the peer review functions, there is evidence in the record that Dr. Waldorf was an important force in initiation of the peer review proceeding. Dr. Islami asserts that Dr. Waldorf's desire to eliminate Dr. Islami as a competitor was manifested in Dr. Waldorf's desire to be an integral part of the review process. Dr. Islami further points out that Dr. Waldorf's involvement in the peer review process also corresponded very closely to the time at which Dr. Islami's problems with the lab began. Dr. Islami essentially believes that Dr. Connell and the hospital joined in the review process which Dr. Waldorf already was pushing and that they joined forces to eliminate Dr. Islami as a source of competition.

While the court has some significant doubts about Dr. Islami's conspiracy theory, the court is not in the position to weigh evidence at the summary judgment stage of the case. The court finds that Dr. Islami has pointed to sufficient factual allegations which infer a genuine issue of fact on the question of conspiracy under § 1. In particular, the court finds four parts of the record which could infer these defendants joined in a conspiracy. First, the time the peer review process actually got underway, and the time Dr. Waldorf began actively participating in the process, corresponded very closely with the problems between Dr. Islami and the hospital generated by Dr. Islami's lab. Second, the court finds Dr. Connell's comments about removing the lab or there would be blood in the halls could infer an indication of his involvement and intent. Third, the court finds the hospital's concern about the competition from Dr. Islami's lab and its involvement in the process to restrict access to the lab indicate a sufficient motive and a previous course of action related to reducing Dr. Islami's ability to compete with the hospital.

Fourth, Dr. Alshabkoun made comments in his review regarding Dr. Islami's involvement with the lab which infers a nexus between the peer review process and the problems with the lab. The court finds each of the aforementioned portions of the record indicate that the defendants had a motive or took actions which could be treated as steps in furtherance of the conspiracy. The court also finds that there are sufficient, but far from overwhelming, inferences that these parties were not acting independently.

The court notes, however, that Dr. Islami has pointed to no specific evidence that connects Dr. Wilson to the conspiracy. In particular, the court finds no evidence to overcome the inference from *Matsushita* that Dr. Wilson was acting independently throughout the peer review process. Hence, the court finds that Dr. Wilson has not been connected to the antitrust portion of this case, and that summary judgment will be entered on the antitrust claim as to him alone.

### (2) Restraint of Trade

■ As *Matsushita* points out, the plaintiff in an antitrust case "must show more than a conspiracy in violation of the antitrust laws; they must show an injury resulting to them resulting from the illegal conduct." 475 U.S. at 586, 106 S.Ct. at 1355. Certain agreements or conspiracies are considered so inherently anticompetitive that the courts consider them illegal *per se* without a further inquiry into the harm that they caused. *Copperweld*, 467 U.S. at 768, 104 S.Ct. at 2740. Other agreements, however, are judged under the rule of reason, probing the reasonableness of the restraint on trade. Under the rule of reason the court makes "an inquiry into market power and market structure designed to assess the [conspiracy's] actual effect." *Copperweld*, 467 U.S. at 768, 104 S.Ct. at 2740. The rule of reason applies to this type of case involving hospital peer review proceedings. *Weiss*, 745 F.2d at 820–22; *Oksanen*, 945 F.2d at 708–09.

The rule of reason requires the court to analyze a variety of factors to determine the "reasonableness of the restraint" imposed. *Weiss*, 745 F.2d at 817. Under the rule of reason the Supreme Court has found that:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The restraint in this case is the peer review process. Here, the court believes there are two particularly probative areas to determine the reasonableness of the restraint: the intent of the defendants in undertaking the peer review process and the effect of the process on the market.

The court in *Johnson v. Nyack Hosp.*, 964 F.2d 116, 121 (2nd Cir.1992) concluded that "[w]hether defendants had a proper medical reason for terminating Johnson's surgical privileges will be dispositive of Johnson's antitrust claims." The *Johnson* court elaborated on the primacy of this determination by finding: "Although revocation of a doctor's privileges may, perforce, eliminate competition by decreasing the number of doctors in a given specialty, this alone will not give rise to an antitrust violation." *Id.* The court in *Miller v. Indiana Hosp.*, 843 F.2d 139, 144–45 (3rd Cir.1988) addressed a case, at summary judgment, where the intent of the parties in undertaking the peer review process was in issue. The *Miller* court found:

The evidence produced by Miller is sufficient to raise a genuine issue of material fact as to whether the hospital's conduct in revoking Miller's staff privileges was, as the hospital claims, because of his incompetence and hence a reasonable restraint or whether it was a result of anticompetitive motivation and thereby constituted a prohibited restraint of trade. That issue is for the fact finder which if it decides that the restraint of trade was unreasonable, will also fix the amount of damages.

843 F.2d at 144–45 (citing *Weiss*). The record in this case is hotly contested on the question of the defendants' intention for initiating and participating in the peer review process. The various positions of the parties, the evidence in support of their positions, and the inferences that they seek the court to draw from that evidence have been discussed at great length in this text. Suffice it to say that this court, like *Miller*, will leave that decision on motivation to the jury.

As noted above, the question of effect on the market also is an important factor in the reasonableness analysis. The effect on the market is another factor which can infer the intent of parties for engaging in peer review. An effect that eliminates competition in favor of the defendants would tend to show that the defendants had something to gain by misusing the peer review process. It also would show an actual restraint on competition which is an antitrust injury. Likewise, if there is little effect on the market, that tends to demonstrate that the defendants had nothing to gain and thus no motivation to use the peer review process to achieve competitive gains. The lack of effect also would show the lack of restraint on competition. The operative idea here is the effect of the conspiracy on the relevant market; the question being did the conspiracy unreasonably restrain trade in the market.

In performing this analysis the court remains mindful that the Sherman Act is a remedy concerned with more than "the fate of 'just one merchant whose business is so small that his destruction makes little difference to the economy.'" *Summit Health, Ltd. v. Pinhas,* —— U.S. ——, ——, 111 S.Ct. 1842, 1848, 114 L.Ed.2d 366 (1991) (quoting *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959)). Stated another way by the Ninth Circuit decision affirmed in *Pinhas:*

To maintain a successful antitrust action, [plaintiff] must show that the alleged conspiracy among the [defendants] did more

than injure [them]; [plaintiff] must prove an injury to competition in the relevant market. Although the emphasis in determining whether an injury has occurred is properly on the injury to competition and not to the competitor, injury to competitors may be probative of injury to competition.

894 F.2d 1024, 1032 (9th Cir.1989) (citations omitted).

Here, the defendants allege that Dr. Islami has been unable to produce sufficient facts of an injury to the relevant market to survive summary judgment. The relevant market considers two different dimensions: product and geography. *Baxley–DeLamar Monuments v. American Cemetery*, 938 F.2d 846, 850 (8th Cir.1991); *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1572 (11th Cir.1991). The relevant products really are not disputed. The court understands them to be diagnostic lab services and thoracic surgery services. The relevant geographical market appears to be in dispute. Dr. Islami asserts that the relevant market should be narrowly defined as the patients available for diagnostic lab treatments and thoracic surgery procedures at Covenant Medical Center in and of itself. Covenant then appears to be Dr. Islami's geographical market. The defendants, on the other hand, want to extend the market at least city wide and even to the Waterloo region.

"[T]he parameters of a given market are questions of fact, and therefore summary judgment is inappropriate if there are material differences." *Thompson*, 934 F.2d at 1573–74 (citation omitted); *see also Baxley–DeLamar*, 938 F.2d at 851 (indicating factual nature of the determination). This court agrees and finds that the question of relevant market is a question for a jury to decide.

The defendants argue, however, that the plaintiff has not alleged specific facts showing that his suspension adversely effected competition in any market. The court disagrees. Dr. Islami has presented evidence that Dr. Waldorf is the only remaining doctor with privileges at Covenant who has the ability to perform thoracic surgery. This at least raises the permissible inference that competition for thoracic surgery at Covenant has been decreased, if not altogether destroyed.

Likewise, Dr. Islami has presented evidence that since his ability to compete for lab patients at Covenant has been diminished, the Covenant lab and the radiologists staffing the lab, including Dr. Connell, have a distinct advantage, if not a monopoly on testing. He present evidence that the lab has been able to utilize more expensive tests more frequently in the face of the reduced competition. He contends that this evidence and the evidence of a monopoly on thoracic surgeries at minimum raises factual questions of effect on the market.

This court agrees. The court again emphasizes that it is not weighing the evidence or making any determination of the weight or credibility of the evidence at this point. The court finds only that Dr. Islami has created a jury question on the issue of whether the peer review process acted as an unreasonable restraint of trade and a jury question on the antitrust count as a whole.

## C. *Reckless Infliction of Emotional Distress*

The defendants also move for summary judgment on Dr. Islami's claim for reckless infliction of emotional distress. The parties agree the elements necessary to establish this claim are as follows:

(1) Outrageous conduct by the defendants;

(2) The defendants' intention of causing, or reckless disregard of the probability of causing emotional distress;

(3) The plaintiff is suffering severe emotional distress;

(4) Actual and proximate causation of the emotional distress by the defendants' outrageous conduct.

*Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984); *Powell v. Khodari–Intergreen Co.*, 334 N.W.2d 127, 129 (Iowa 1983). The defendants assert Dr. Islami has not presented evidence to create a jury question in this case. This court agrees.

In Iowa "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting *M.H. By and*

*Through Callahan v. State,* 385 N.W.2d 533, 540 (Iowa 1986)). The Iowa courts have stated that "[i]n order for conduct to be considered outrageous it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Cutler,* 473 N.W.2d at 183 (quoting *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 636 (Iowa 1990)). Here, even if the court were to assume that the defendants did fail to provide Dr. Islami with procedural due process and intentionally interfere with his business relationship, the court does not find that such conduct raises to the level of outrageous conduct as defined by the Iowa courts. The court must note that it does not believe that the antitrust activity alleged here, even if true, would be subject to this analysis. The antitrust laws already take into account the egregious nature of antitrust violations through the availability of treble damages. This court does not believe that the antitrust conduct in this case, if established, would be considered so outrageous so as to be subject to additional sanctions for emotional distress.

■ Dr. Islami also has failed to present sufficient evidence that he is suffering from *severe* emotional distress. In his affidavit, Dr. Islami states that he has suffered from emotional distress manifested in the form of nightmares, headaches, dizziness, anxiety, and loss of enthusiasm for his career as a result of the activity of the defendants. The defendants claim that this insubstantial evidence of emotional distress is not sufficient under Iowa law. This court agrees.

In *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 261 (Iowa 1991), the Iowa Supreme Court addressed what constituted "severe emotional distress." *Bates* initially arose out of an auto accident in which Bates and another crashed at an intersection with a stoplight. Bates claimed that he had the green light but the driver of the other car and his passenger also claimed they had the green light. Bates was given a traffic citation but was acquitted of the charge at a jury trial. Bates then sued the driver of the other car in tort. The driver's insurance carrier (Allied) defended the case. The defendant's attorney Mr. La Suer found out during the trial that the statement of the

defendant and his passenger that the light was green were fabricated. The attorney immediately settled the case with Bates without disclosing the misstatement to Bates or his attorney. The attorney also did not tell Bates or his attorney either that the settlement was not for the full policy limit or that the settlement was structured to prevent Bates from recovering on his own underinsurance policy. The settlement was eventually set aside and Bates received full recovery on the defendant driver's policy and was allowed to pursue his own underinsured claim.

Bates then sued Mr. La Suer and Allied. Bates alleged intentional infliction of emotional distress as one claim. In support of that claim he alleged: he was so angry as to feel physical pain; he had sleepless nights; it made him feel cheated by the legal system; he cannot trust people anymore; he is haunted with the feeling he could have died in the collision and gone to his grave a marked man; these feelings occupy his waking moments, interrupt his sleep, and prevent him from enjoying life; although the physical injuries are healed, he remains anxious feeling vulnerable and helpless. *Bates,* 467 N.W.2d at 261. The Iowa Supreme Court concluded that even if true, the allegations "fall short of the necessary showing to establish a claim of intentional infliction of emotional distress." *Id.* This court finds that Dr. Islami's allegations are very similar to those in *Bates* and likewise fall short of the necessary showing.

Based on the analysis above, the court concludes that Dr. Islami has failed to establish two elements his claim of intentional infliction of emotional distress. Therefore, this court will grant the defendants' motion for summary judgment on the claim of intentional infliction of emotional distress.

D. *Intentional Interference with Business Relations*

■ The defendants' final argument in support of their motion for summary judgment is that Dr. Islami has failed to present evidence sufficient to create a jury question on his claim of intentional interference with business relations. The elements that Dr. Islami must establish are:

(1) An existing valid contractual relationship or business expectancy;

(2) Knowledge of this by the interferer;

(3) Intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) Resulting damages.

*Locksley v. Anesthesiologists of Cedar Rapids,* 333 N.W.2d 451, 457 (Iowa 1983) (citation omitted).

Here, the existence of the business relationship between Dr. Islami and the hospital is really without dispute. Likewise, the defendants' knowledge of this fact is really without dispute. The real question is whether the defendants intentionally interfered with the relationship. The court believes that the evidence Dr. Islami has presented which raised an issue of fact on the question of motive in the antitrust analysis likewise is sufficient evidence to raise a genuine issue of fact on this claim.

### Summary and Conclusion

The court denies Dr. Islami's motion for summary judgment finding that there is a genuine issue of material fact about whether the defendants' complied with the bylaws by providing Dr. Islami procedures which were fair under the circumstances. The court denies in part and grants in part the defendants' motion for summary judgment. The court denies the defendants' motion for summary judgment to the extent that it is based on the Federal and Iowa immunity statutes. The court finds there are genuine disputes of material fact about whether the immunity standards are satisfied. The court also denies the defendants' motions for summary judgment to the extent that it applies to Dr. Islami's antitrust claim against Dr. Connell, Dr. Waldorf, and Covenant. The court, however, will grant the defendants' motion for summary judgment on the extent that it applies to the antitrust claim against Dr. Wilson. The court also will grant the defendants' motion for summary judgment on Dr. Islami's claim for intentional infliction of emotional distress. The court finds that the evidence submitted by Dr. Islami in support of that claim, even if accepted as true, to be insufficient to establish that claim as a matter of law. Finally, the court denies Dr. Islami's claim for intentional interference with a business relationship. The court finds issues of material fact on that claim.

### ORDER

Accordingly;

IT IS ORDERED that Dr. Islami's motion for summary judgment is denied.

IT IS ALSO ORDERED that the defendants' motion for summary judgment is denied in part and granted in part in accordance with the foregoing text.

Done and Ordered.